585 A.2d 256

**Helen COLLIER, Personal Representative of the Estate of Loid Collier, et al.**

v.

**EAGLE-PICHER INDUSTRIES, INC., et al.**

**No. 577, Sept. Term, 1990.**

Court of Special Appeals of Maryland.

Feb. 5, 1991.

Patricia J. Kasputys (Peter G. Angelos, on the brief), Baltimore, for appellants.

Richard P. Kidwell, Stephen J. Hughes and Miles & Stockbridge, Baltimore, on the brief, for appellant, Corhart.

Stephen J. Hughes (Richard P. Kidwell, Miles & Stockbridge, Baltimore, Dennis Whelley, Mann & Whelley, John W. Geldmacher and Parks, Hansen & Ditch, on the brief), Towson, for appellees.

Peter G. Angelos, Patricia J. Kasputys, Baltimore, on the brief for appellees, Floyd, Chappel, Parto, Morosko and Wilkens.

Argued before WILNER, C.J., ALPERT, JJ., and JAMES S. GETTY, Judge (Retired), Specially Assigned.

WILNER, Chief Judge.

The appeals now before us arise from consolidated proceedings in the Circuit Court for Baltimore County in which several plaintiffs sued several defendants to recover for injuries resulting from the plaintiffs' exposure to asbestos-containing products. Each of the defendants was alleged to have manufactured, sold, or supplied such a product to which the plaintiffs were exposed while employed at the

Bethlehem Steel Corporation plant in Sparrows Point, Maryland.[1]

We are concerned, most immediately, with eight of the plaintiffs and three of the defendants, although the status of several other defendants is also relevant. One aspect of this proceeding—the appeal by the plaintiffs and a cross-appeal by the three defendants—concerns the Uniform Contribution Among Tort–Feasors Act (Md.Ann.Code art. 50, §§ 16–24) and the way in which the Circuit Court applied it. A second aspect—a separate appeal by defendant Corhart Refractories Company (Corhart)—touches on an evidentiary issue and challenges whether the plaintiffs produced legally sufficient evidence that they were exposed to an asbestos-containing product supplied by Corhart. A third, preliminary, aspect is whether, by reason of petitions filed by the other two defendant-appellees/cross-appellants under Chapter 11 of the Federal Bankruptcy Act, we may even proceed to decide these appeals.

The first and third aspects are especially related, and so we shall start with them. They involve five of the plaintiffs —Collier, Wilkins, Regula, Pilachowski, and Morosko—and the three defendant-appellees/cross-appellants—Eagle–Picher Industries, Inc. (Eagle–Picher), The Celotex Corporation (Celotex), and Corhart.

## I. PROCEEDINGS CONCERNING THE UNIFORM ACT

The appeals and cross-appeals challenging the manner in which the court dealt with the Uniform Act are presented to us through an agreed Statement of the Case and one exhibit, and so we do not have a record extract containing the pleadings and relevant motions or documenting all that occurred in the Circuit Court with respect to these matters.

---

1. In some of the cases, the injured employee had died and the actual plaintiffs were his personal representatives or dependents. For purposes of these appeals, that is unimportant.

Each of the five plaintiffs had initially sued other defendants in addition to Eagle–Picher, Celotex, and Corhart, apparently on the theory that they too had manufactured, sold, or supplied asbestos-containing products to which the plaintiffs were injuriously exposed. The plaintiffs eventually settled with those defendants, however, entering some settlements prior to trial and some during trial. In addition to the more-or-less standard language effecting a release of liability, the form of release given to each of those defendants stated, in relevant part, that:

"This Release does not and shall not bar any cause of action, right, lien, or claim arising from the said claim which the undersigned have or may have in the future against any other alleged tortfeasors or any other person or entity not specifically named herein and released hereby, but shall serve only to reduce any recovery which may be had against the said other alleged tortfeasors or other person or entity to the extent of the pro-rata share recoverable by law from Releasees, in accordance with the provisions of the Uniform Contribution among Joint Tortfeasors Act of Maryland, Art. 50, Section 16 *et seq.*, Md.Ann.Code. *The said reduction effected hereby shall not be construed to affect the recovery in any suit, cause of action or claim to which the said Releasees shall not have been adjudged legally liable for contribution.*

It is understood and agreed that this settlement is in compromise of a disputed claim, and that the payment made is not to be construed as an admission of liability on the part of the Releasees, and that said Releasees deny any liability and intend merely to avoid litigation."

(Emphasis added.)

The parties had agreed that the defendants who settled before trial would not appear at trial and that those who settled during trial would thereafter cease to participate. Through a general pre-trial order, each of the defendants was deemed to have filed cross-claims against all other defendants, and it was further agreed that those cross-

claims, which we assume were for contribution, would not be submitted to the jury but would instead be resolved by the court in a post-trial proceeding. The defendants, but not the plaintiffs, had also agreed that, at that proceeding, the evidence admitted at the jury trial bearing on the liability of the settling defendants could be considered in determining the cross-claims.

After rendition of the jury's verdicts in favor of the five plaintiffs, the court conducted a proceeding to resolve the cross-claims. What actually occurred is not clearly reflected in the agreed Statement of the Case, but it appears that (1) the initial phase of the proceeding was to determine which of the settling defendants were joint tortfeasors, (2) the plaintiffs, over their objection, were excluded from participating in that phase on the ground that they had no interest, and therefore no standing, in the matter, and (3) no additional evidence was presented to the court as to who was, or was not, a joint tortfeasor. The defendants presented memoranda to the court explaining their respective positions, to which were attached excerpts from the evidence admitted at trial.

After considering the memoranda, the court determined, in some form and manner not clearly reflected in the Statement of the Case, which of the settling defendants were joint tortfeasors with Eagle–Picher, Celotex, and Corhart. Following that determination, the court addressed what, if any, reductions should be made to the verdicts by reason of the various settlements and releases. The plaintiffs were permitted to participate, and did participate, in that phase of the proceeding.

A number of different views were presented to the court. Eagle–Picher, Celotex, and Corhart moved that the verdicts be reduced by all amounts or *pro tanto* shares paid by all of the settling defendants, whether or not they were joint tortfeasors. The court rejected that motion. The issue then became the amount of credit that ought to flow from a joint release that each of the plaintiffs had separately entered into with three defendants—GAF, Inc. (GAF), Quig-

ley Company, Inc. (Quigley), and Keene Corporation (Keene) —who were part of a group known as the Center for Claims Resolution. A single, aggregate sum was paid to each of the plaintiffs on behalf of all three of those defendants in exchange for the joint release. The release did not indicate what, if any, contribution to that sum was made by the respective defendants.

The dispute between the parties arose from the fact that, in the first phase of the post-trial proceeding, the court had determined that two of the three defendants so released— GAF and Quigley—were *not* joint tortfeasors in these cases; only Keene was found to be a joint tortfeasor. The question, then, was whether, for purposes of the Uniform Act, the entire amount paid for the joint release or only the amount contributed by Keene was to be regarded as the "consideration paid for the release." The relevance, and importance, of this determination is evident from one section of the Act—§ 19 of art. 50—and from the language of the release itself.

Section 19 provides:

"A release by the injured person of one joint tort-feasor, whether before or after judgment, does not discharge the other tort-feasors unless the release so provides; but reduces the claim against the other tort-feasors in the amount of the consideration paid for the release, or in any amount or proportion by which the release provides that the total claim shall be reduced, if greater than the consideration paid."

The release, as noted earlier, provides for a reduction of any recovery against the "other alleged tortfeasors or other person or entity to the extent of the pro-rata share recoverable by law from Releasees, in accordance with [the Uniform Act]" but made clear that the "reduction effected hereby shall not be construed to affect the recovery in any suit, cause of action or claim to which the said Releasees shall not have been adjudged legally liable for contribution."

The plaintiffs offered evidence that the parties to the releases intended to consider each of the three released defendants as having paid "equal proportional shares of the consideration" and thus urged the court to consider, as the "consideration paid for the release," only the contribution by Keene—the sole joint tortfeasor among the three releases. That would have made Keene's *pro rata* share greater than the actual dollar consideration in the Collier, Regula, and Morosko cases, thus causing the judgments to be reduced by the former rather than the latter. Eagle–Picher, Celotex, and Corhart, on the other hand, insisted that the full amounts paid to the plaintiffs be regarded as the consideration for the respective releases, in which event it would exceed Keene's *pro rata* share and therefore become the credit to be applied against the judgments. The results flowing from the divergent views as to this set of joint releases can be illustrated as follows:

| Plaintiff | Collier | Wilkins | Regula | Pilachow | Morosko |
|---|---|---|---|---|---|
| (1) Judgment | $225,000 | $50,000 | $75,000 | $50,000 | $140,000 |
| (2) # Jt. Tortf. | 8 | 8 | 7 | 5 | 7 |
| (3) Pro Rata Share | 28,125 | 6,250 | 10,714 | 10,000 | 20,000 |
| (4) Total Jt. Rel. Consid. | 61,500 | 22,275 | 19,762 | 39,375 | 54,000 |
| (5) Keene's Share Of (4) | 20,500 | 7,425 | 6,587 | 13,125 | 18,000 |
| (6) Net if (3)(5) applied | 56,250 | 11,575 | 21,428 | 16,875 | 60,000 |
| (7) Net if (4) Applied [2] | 22,875 | 0 | 12,380 | 0 | 26,000 |

The court adopted the defendants' views on this issue. It refused to accept the plaintiffs' proffer as to the actual contribution by Keene and regarded the full amounts paid for the joint releases as the "consideration paid for the release." Judgments were therefore entered as indicated in Item (7), rather than Item (6), above.

In their appeal, the plaintiffs complain that the court erred (1) in not allowing them to participate in the proceed-

---

**2.** The "net" figures reflect certain other deductions not disputed in this appeal.

ing to adjudicate which of the settling defendants were joint tortfeasors, and (2) in applying as a credit against their respective judgments the full amount of consideration paid for the joint releases of GAF, Quigley, and Keene. In a cross-appeal, Eagle–Picher, Celotex, and Corhart urged that the court erred in not reducing the judgments "by the *pro tanto* amounts of all settlement monies received [by the respective plaintiffs]." Those issues comprise the first aspect of the composite appeals.

The third aspect, noted earlier, arises from the fact that on October 12, 1990—after these appeals had been noted—Celotex filed for protection under Chapter 11 of the U.S. Bankruptcy Code. This Court then entered an order staying all proceedings in the appeals as to Celotex but allowing the appeals to proceed as to all other parties. Subsequently, Eagle–Picher and Corhart moved that the appeals be stayed as to them as well until Celotex could once again participate in the proceedings. On the day before oral argument, we were informed that Eagle–Picher had also filed a petition under Chapter 11. We therefore stayed the appeals as to it, leaving the question whether the appeals can proceed against Corhart, the one remaining appellee. Because that is a threshold issue, we shall address it first.

## II. STAY OF THE APPEAL

█ Preliminarily, we note that the bankruptcies of Celotex and Eagle–Picher in no way affect the separate cross-appeal by Corhart, which deals, as we have indicated, with whether the plaintiffs sufficiently proved liability on its part. The only aspects of these appeals that could even arguably be affected by the bankruptcies are those relating to the reductions ordered in the verdicts by reason of the settlements.

Title 11 U.S.C. § 362(a) provides, in relevant part and with certain exceptions not applicable here, that the filing of a petition under Chapter 11 of the Bankruptcy Act operates as a stay of judicial proceedings pending against the debtor

when the petition was filed. We have, as noted, complied with that provision by staying this proceeding as to Celotex and Eagle–Picher—the debtors in bankruptcy. "It is universally acknowledged," however, "that an automatic stay of proceeding accorded by § 362 may not be invoked by entities such as sureties, guarantors, *co-obligors*, or others with a similar legal or factual nexus to the Chapter 11 debtor." *Lynch v. Johns–Manville Sales Corp.*, 710 F.2d 1194, 1196 (6th Cir.1983) and cases cited therein; *see also Williford v. Armstrong World Industries, Inc.*, 715 F.2d 124 (4th Cir.1983); *Matter of Johns–Manville Corp.*, Bkrtcy., 26 B.R. 405 (S.D.N.Y.1983); *Credit Alliance Corp. v. Williams*, 851 F.2d 119 (4th Cir.1988).

· ▮ In conformance with this principle, it is well established that an automatic stay under § 362 does not usually affect a State court's ability to proceed with either a trial or an appeal involving a debtor's co-defendants, so long as the proceeding is stayed as to the debtor. *See Wright v. Eagle–Picher*, 80 Md.App. 606, 608 n. 1, 565 A.2d 377 (1989); *Ace Tile Co., Inc. v. Casson Const. Co., Inc.*, 715 P.2d 344, 346 (Col.App.1986); *Gen. Motors Accept. Corp. v. Yates Motor Co.*, 159 Ga.App. 215, 283 S.E.2d 74 (1981); *Centrust Services, Inc. v. Guterman*, 160 A.D.2d 416, 554 N.Y.S.2d 113, 114–15 (A.D. 1 Dept.1990); *Commercial Finance v. American Resources*, 737 P.2d 1120, 1131 (Haw. App.1987); *Greenberg v. Fincher & Son Real Estate, Inc.*, 753 S.W.2d 506 (Tex.Ct.App.1988).

In *Royal Truck & Trailer v. Armadora, Etc.*, 10 B.R. 488 (N.D.Ill.1981), and *Matter of Johns–Manville Corp.*, *supra*, 26 B.R. 405, the Court, though reciting the general rule that proceedings against non-debtor co-defendants are not automatically stayed under § 362(a), indicated that "there are instances where a *bankruptcy court* may properly stay proceedings against non-bankrupt co-defendants." 26 B.R. at 410 (emphasis added). *See also A.H. Robins Co., Inc. v. Piccinin*, 788 F.2d 994 (4th Cir.), *cert. denied*, 479 U.S. 876, 107 S.Ct. 251, 93 L.Ed.2d 177 (1986); *Credit Alliance Corp. v. Williams*, *supra*, 851 F.2d 119. In the

instant proceeding that has not happened, at least not to our knowledge. We know of no stay entered by either Bankruptcy Court precluding us from proceeding as to Corhart.

Nor, significantly, has either Eagle–Picher or Celotex asked this Court to stay proceedings as to Corhart by reason of their respective bankruptcies. The request comes from Corhart, and we see no basis for such a stay. In *A.H. Robins Co., Inc., supra*, the Fourth Circuit Court of Appeals held that there must be "unusual circumstances" to warrant a stay of proceedings against co-defendants. At 999, it noted:

> "This 'unusual situation,' it would seem, arises when there is such identity between the debtor and the third-party defendant that the debtor may be said to be the real party defendant and that a judgment against the third-party defendant will in effect be a judgment or finding against the debtor. An illustration of such a situation would be a suit against a third-party who is entitled to absolute indemnity by the debtor on account of any judgment that might result against them in the case. To refuse application of the statutory stay in that case would defeat the very purpose and intent of the statute."

See also 1008 where the Court concluded that actions against a debtor's co-defendants may be enjoined where, if the actions were successful, they would "affect the property of the debtor to the detriment of the debtor's creditors as a whole."

Corhart seems to argue that such would be the case here—that if we were to conclude that the trial court erred in applying the full consideration paid for the joint releases against the judgments, the effect would be to increase "the joint Judgment." It contends that "[t]here is no legal authority which would permit this Court or the Trial Court to increase the amount of the Judgment against one Joint Tortfeasor ... and not the other...." We disagree.

Three of the judgments at issue here—those obtained by the Collier, Regula, and Pilachowski plaintiffs—were against only Eagle–Picher and Celotex. Because we have stayed the appellate proceedings as to those two defendants, we shall not consider any challenge to those judgments. Subject to a decision in some future proceeding conducted when and if those stays are lifted, those three judgments will remain intact as entered.

Corhart's motion to stay goes only to the other two judgments—those won by the Wilkins and Morosko plaintiffs—which, we presume, were entered against Eagle–Picher, Celotex, and Corhart jointly *and severally*.[3] Because there is several, as well as joint, liability, the plaintiffs can, at their election, proceed against Corhart alone. Indeed, because of the § 362(a) stays, that is the only defendant against whom they can presently proceed.

Neither Eagle–Picher nor Celotex will, or can be, bound directly by any mandate we may issue with respect to those judgments. Nor would they be subject to the bar of *res judicata* or collateral estoppel. In short, despite Corhart's suggestion to the contrary, nothing we may do in this appeal can or will increase the judgments entered against Eagle–Picher or Celotex or require them to pay anything more than they are now obligated to pay.

It is possible, of course, should we find error in the reductions ordered by the court and cause the two judgments to be increased, that at some future time either the plaintiffs or Corhart might try to recover the additional amounts from Eagle–Picher or Celotex. In that event, those defendants may have to contend with the possible *stare decisis* effect of this Opinion, as we propose to publish it, but they will be legally free to resist the attempt and

---

3. The form of the judgments is not included or indicated in the Joint Statement of the Case. There is nothing in that Statement to suggest that they were not in the usual form of joint tortfeasor judgments, however, which impose joint and several liability.

urge that our decision is (1) not binding on them, and (2) wrong.

That, as a practical matter, Eagle–Picher or Celotex might find itself in a less advantageous position in such a circumstance than it would be if we declined to rule at all does not, in our view, constitute the kind of "unusual situation" envisioned by the Fourth Circuit Court of Appeals. Moreover, any indirect detriment to those defendants from not staying the appeal as to Corhart has to be weighed against the clear and immediate detriment to the two plaintiffs if we do stay it. After years of litigation, a jury found that they were injured by Corhart's tortious conduct and awarded them damages. If the court erred in reducing those awards, we should proceed as swiftly as possible to correct that error, at least to the extent we are able to do so.

For all of these reasons, we deny the motion of Corhart to stay the appellate proceedings as to it.

## III. REDUCTIONS IN VERDICTS

### A. *Introduction*

The complaints made about the reductions ordered by the court present three separate, though interrelated, issues. The first basic premise adopted by the court was that only amounts paid in settlement by defendants deemed to be joint tortfeasors would be considered in calculating the reductions; amounts paid by non-joint tortfeasors would not be considered. That ruling is challenged by Corhart in its cross-appeal; as noted earlier, it believes that all amounts paid in settlement should be considered, whether or not the payor was a joint tortfeasor.

The second issue stems directly from the first. As we observed, the court determined who among the settling defendants were joint tortfeasors at a post-trial proceeding on the various defendants' cross-claims for contribution, in which the plaintiffs were not permitted to participate. The plaintiffs complain that, because the determination of

whether a settling defendant was a joint tortfeasor had a direct effect on the amount of their ultimate judgments, they had a legally cognizable interest in that determination and should have been permitted to participate in the proceeding.

The third issue focuses entirely on the joint releases given to GAF, Quigley, and Keene. As we indicated, the plaintiffs proffered evidence to show that Keene contributed one-third of the aggregate amount paid for those releases, urging that, because only Keene, among those defendants, was found to be a joint tortfeasor, only its contribution and not the aggregate sum should be considered as the consideration paid for the releases. The court, as noted, rejected both the proffered evidence and the argument and found the aggregate amounts to be the consideration paid for the releases.

We shall deal with these issues *seriatim.*

### B. *Amounts Paid By Non–Joint Tortfeasors*

The argument, initially presented by Eagle–Picher, Celotex, and Corhart but considered now only as to Corhart, proceeds from the common law principle that a plaintiff is generally entitled to only one recovery for the wrong done to him and that the extent of that recovery is measured ultimately by the jury's verdict. This principle, it claims, has not been altered by passage of the Uniform Act. All that the Act did, it contends, was to abrogate the common law rule that a settlement with one alleged tortfeasor extinguished the plaintiff's right to proceed against other tortfeasors, in favor of the rule permitting such actions to proceed but reducing any judgment entered against the non-settling defendant by whatever was recovered in settlement with the other alleged tortfeasors. In essence, Corhart interprets the Act as permitting, or at least not precluding, the deduction of any amount or *pro tanto* share paid by a person whom the plaintiff ever *alleged* was a joint tortfeasor, whether or not that person was ever found or declared to be a joint tortfeasor. Only in that way, it says,

can the law effectively protect against a windfall recovery by the plaintiff. We reject that contention, at least in the form and breadth presented.

Citing some language used in two pre-Act cases—*Gunther v. Lee*, 45 Md. 60 (1876) and *Cox v. Md. Elec. Rwys Co.*, 126 Md. 300, 95 A. 43 (1915)—Corhart asserts that, at common law, a release given to *anyone* in connection with an injury sufficed to preclude a plaintiff from proceeding against others in connection with the injury. It concedes that, by virtue of the Act, the rule precluding further proceedings has been abrogated. It claims, however, that the common law rule, as construed by it, survives in a transmogrified form as a complement, or supplement, to the statute. The "one-injury-one-recovery" principle, it asserts, requires that the statutory scheme of dollar for dollar or *pro tanto* reductions be applied with respect to *all* settlements made by the plaintiffs, whether or not the releasee is a joint tortfeasor.

We find no merit in that argument. In the first place, Corhart's view of the common law is incorrect; the rule was never actually applied in Maryland as Corhart suggests. The language seized upon by Corhart originated in *Gunther v. Lee, supra,* where a homeowner sued her neighbor and contractors employed by the neighbor for damage done to her property by reason of work done on the neighbor's home. It seems clear from the Opinion that the three defendants were sued as classic common law joint tort-feasors, having allegedly acted in concert to produce the harm. Prior to trial, the plaintiff settled with the neighbor and gave her a release that, on the one hand, acknowledged full satisfaction for the trespasses complained of in the suit but, on the other, purported to reserve the plaintiff's claims against the co-defendants. Applying the traditional common law rule, the Court of Appeals held that the release of the neighbor also served to release the other defendants. Unfortunately, in explaining the rule, the Court cited a Supreme Court case—*Lovejoy v. Murray*, 3 Wall. 1, 18 L.Ed. 129 (1866)—for the proposition that "when the plain-

tiff has accepted satisfaction in full for the injury done to him, *from whatever source it may come,* he is so far affected in equity and good conscience, that the law will not permit him to recover again for the same damages." 45 Md. at 67 (emphasis supplied).

Corhart looks upon this emphasized language as indicating that even settlements made with non-joint tortfeasors sufficed to preclude actions against other defendants. We think it reads too much into that language. For one thing, it is ambiguous; more importantly, it is mere *dicta,* for, as we indicated, the release at issue was given to one who clearly was a joint tortfeasor. See also *Berkley v. Wilson,* 87 Md. 219, 39 A. 502 (1898), where the rule was applied with respect to concurrent tortfeasors, i.e., those who did not act in concert but whose separate conduct concurred in producing the harm.

*Cox, supra,* 126 Md. 300, 95 A. 43, involved a wrongful death action brought by the dependents of a telephone company lineman against a streetcar company for negligence causing the death of the lineman. The nature of the alleged negligence is not clear from the Court's Opinion. In a special plea, the defendant asserted that the plaintiffs had previously sued the telephone company to recover for the same tort and had settled that case, received money from the telephone company, and given it an order of satisfaction which was placed on the docket. Ignoring the allegations made in their complaint against the telephone company, the plaintiffs asserted that the telephone company was not a joint tortfeasor, that the settlement money was in the nature of an insurance benefit or wages paid from an employees' pension and disability fund, and that the settlement should not preclude the action against the streetcar company.

There was substantial evidence, noted by the Court, contradicting those assertions. The complaint against the telephone company apparently sought damages for negligence, not the recovery of wages or an insurance benefit, and the power of attorney given to the plaintiffs' attorney autho-

rized him to settle for a sum to be paid from the employee benefit plan "or otherwise." In other words, as in *Gunther* and *Berkley*, there was ample evidence that the settling defendant was, in fact, at least a concurrent tortfeasor and not a mere volunteer. Nonetheless, in addressing the plaintiffs' argument, the Court noted, 126 Md. at 305, 95 A. 43, that "[i]n some jurisdictions it has been held essential that the party to whom a release has been given or with whom a settlement has been made shall be one of two or more joint *tort feasors* in order to discharge the others from liability," but that "in other States, including Maryland, it is not essential that the party with whom the settlement is made or by whom the release is given shall be a joint *tort feasor* in order to release others from liability." The only authority cited for the Maryland rule were *Gunther* and *Berkley*.

That this language, which we conclude was merely incidental, did not reflect the actual Maryland law was made clear in two subsequent cases. In *Elling v. Travers*, 162 Md. 597, 160 A. 789 (1932), the plaintiff, a passenger in a taxicab, was injured when the cab collided with a car owned by Travers. She settled with Travers, giving him a covenant not to sue which, under the holding in *Lanasa v. Beggs*, 159 Md. 311, 151 A. 21 (1930), was the equivalent of a release. She then sued to set the covenant aside, claiming that it was procured upon the fraudulent misrepresentation that it would not preclude her from proceeding against the cab company. The Court concluded that, absent a showing that Travers was actually at fault in the accident, the covenant would not have that effect in any event. 162 Md. at 605, 160 A. 789, the Court held:

"The effect of such an agreement would be to release the taxicab company also, in the event, *and only in the event*, that some tortious act on the part of the Traverses contributed to the accident in which Mrs. Elling was injured. If it did so contribute, then, under the case of *Lanasa v. B[e]ggs*, 159 Md. 311, 151 A. 21, the covenant not to sue the Traverses releases it. If it did not so contribute, and the accident was occasioned solely by the

tort of the taxicab company, it had no such effect, *for the doctrine that the release of one joint tortfeasor releases all has no application unless there is a joint tort."* (Emphasis added.)

Unlike the language from *Gunther* and *Cox*, this was a clear holding by the Court, and it was confirmed, unmistakably, six years later in *Carroll v. Kerrigen*, 173 Md. 627, 197 A. 127 (1938). *See also* W. Allen, *Joint Tortfeasors: Contribution, Indemnity and Procedure,* paper read before the Barristers Club of Baltimore (March 30, 1948), reprinted in *The Daily Record* (June 7, 1948). It is evident, then, that Corhart's reliance on *Gunther* and *Cox* is misplaced. Under Maryland pre-Act common law, a release given to a mere volunteer—one who was not, in fact, liable to the plaintiff—did not preclude the plaintiff from recovering against persons who *were* liable.

The Uniform Act was intended to replace the common law rules; its primary purpose "was to create a right of contribution *among joint tortfeasors,* which did not exist at common law ... and to establish a procedure whereby that right might be made effective in practice." (Emphasis added.) *Baltimore Transit Co. v. State,* 183 Md. 674, 679, 39 A.2d 858 (1944); *Montgomery County v. Valk,* 317 Md. 185, 190, 562 A.2d 1246 (1989). The restriction of the Act to joint tortfeasors was consistent with the reach of the common law rules. Lest there be any lingering doubt, however, we now hold that issues of reduction and contribution based on settlements entered into by plaintiffs are governed by the Act and that only releases given to joint tortfeasors will give rise to rights of reduction and contribution. *See Montgomery County v. Valk, supra,* 317 Md. 185, 562 A.2d 1246; *Allgood v. Mueller,* 307 Md. 350, 355, 513 A.2d 915 (1986).

### C. *Determination of Joint Tortfeasor Status*

The Uniform Act, art. 50, § 16(a), defines "joint tort-feasors" as "two or more persons jointly or severally liable in tort for the same injury to person or property,

whether or not judgment has been recovered against all or some of them." Where a plaintiff has, at some time, claimed that two or more persons have contributed to his injury by their respective tortious conduct, two questions may arise: (1) whether the conduct of those persons falls within the scope of the definition and (2) how that determination is to be made. Where no settlements have occurred, the liability of all such persons is ordinarily determined by the trier of fact, and so both questions are answered by the verdicts. That pertains as well in those cases where one or more settlements have occurred but the liability of the settling defendants, but for the settlements, is nonetheless submitted to and determined by the trier of fact.

 The problems arise, most frequently, where the actual liability of the settling defendant is *not* determined by the trier of fact. Resort then is made, at least initially, to the language of the release. In some instances, the settling parties specify in the release that the releasee is to be regarded as a joint tortfeasor, even though he may disclaim liability. *See, for example, Martinez v. Lopez*, 300 Md. 91, 94, 476 A.2d 197 (1984); *Jones v. Hurst*, 54 Md.App. 607, 459 A.2d 219 (1983). In that event, the releasee's status as a joint tortfeasor is contractually determined. Conversely, the settling parties may specify in the release that the releasee shall *not* be regarded as a joint tortfeasor unless adjudicated as such, in which event the releasee will be regarded as a mere volunteer absent a judicial determination of his liability. *Allgood v. Mueller*, 307 Md. 350, 513 A.2d 915 (1986).

 The releases before us, as reflected in the exhibit to the joint Statement of the Case, are not quite so clear cut. They do not specify that the releasee is, or is not, a joint tortfeasor. The releasee continues to deny liability. The releases provide for a reduction in any recovery against "other alleged tortfeasors" to "the extent of the pro-rata share recoverable by law from Releasees" but make clear that "[t]he said reduction effected hereby shall not be

constructed to affect the recovery in any suit, cause of action or claim *to which the said Releasees shall not have been adjudged legally liable for contribution.*" (Emphasis added.) The word "adjudged" ordinarily connotes a judicial determination. *Vasquez v. Courtney,* 272 Or. 477, 537 P.2d 536 (1975); *Dobbins v. Economic Gas Co.,* 182 Cal. 616, 189 P. 1073, 1082 (1920); *Western Assur. Co. v. Klein,* 48 Neb. 904, 67 N.W. 873, 874 (1896); *People v. Rave,* 364 Ill. 72, 3 N.E.2d 972, 975 (1936). The emphasized language, we think, makes the release more akin to that construed in *Allgood v. Mueller, supra,* namely, that the parties intended for the releasee not to be regarded as a joint tortfeasor unless its liability to the plaintiff was judicially determined.

■ Given that construction of the release, it becomes clear that the post-trial proceeding in which the joint tortfeasor status of the settling defendants was resolved was one in which the plaintiffs had a definite interest. Whether those defendants, or any of them, were joint tortfeasors affected not only the rights and obligations of contribution among the defendants but also the extent of any reductions in the verdicts against Eagle–Picher, Celotex, and Corhart. The plaintiffs therefore had a very clear and substantial interest in those determinations and, absent any claim of waiver, had a right to participate in that aspect of the proceeding. Surely, had the issue of the settling defendants' liability been submitted to the jury rather than reserved for determination by the court, the plaintiffs would have had the right to present evidence and argue their respective liability.

The court erred in precluding the plaintiffs from offering evidence and argument as to which, if any, of the settling defendants were joint tortfeasors, and, as the plaintiffs apparently dispute the court's conclusions as to the status of some or all of those defendants, the error was prejudicial.

### D. *Joint Release Of GAF, Quigley, and Keene*

■ As we indicated, each of the plaintiffs executed a single release of GAF, Quigley, and Keene for a single,

aggregate sum. As a result of the post-trial proceeding, only one of those companies—Keene—was found to be a joint tortfeasor. The court rejected plaintiffs' proffer of evidence tending to show that Keene had, in each instance, contributed one-third of the aggregate sum and instead regarded that aggregate sum as the consideration paid for the release. It then compared the aggregate consideration with Keene's *pro rata* share of the judgments, found the former to be greater in amount than the latter, and reduced the verdicts accordingly.

Section 19 of art. 50 provides for a reduction in the claim against non-settling joint tortfeasors "in the amount of the consideration paid for the release, or in any amount or proportion by which the release provides that the total claim shall be reduced, if greater than the consideration paid." The release, as we indicated, provides for a reduction "to the extent of the pro-rata share recoverable by law from Releasees" except as to a claim "to which said Releasees shall not have been adjudicated legally liable for contribution."

We have concluded in Part III B of this Opinion that, under the Uniform Act, reductions and contributions are required only with respect to sums paid by joint tortfeasors. The language of the release is consistent with that principle. Thus, it is clear that the *pro rata* share to be taken into account is that of Keene alone; no share of the judgments is to be attributed to non-joint tortfeasors (GAF and Quigley). That aspect of the court's ruling is correct. The question is whether that individual share is to be weighed against the aggregate consideration. We think it should not be; we believe that the plaintiffs were entitled, under the circumstances, to offer evidence of Keene's contribution to the aggregate sum and that only its contribution should have been considered.

The view taken by the court and espoused by Corhart is inconsistent with the clear purpose, if not the actual language, of both § 19 and the release. If the plaintiffs can produce credible evidence showing that Keene contributed

only part of the aggregate consideration, to preclude that evidence and count the aggregate amount paid would be tantamount to reducing the verdict by reason of amounts paid by persons who were found not to be joint tortfeasors. On remand, therefore, the plaintiffs must be permitted to produce such evidence, otherwise admissible, tending to show the amount contributed by Keene (if Keene is still found to be a joint tortfeasor) and only that amount should be declared to be the consideration paid for the release.

## IV. CORHART'S CROSS–APPEAL

Five of the plaintiffs—Floyd, Chappel, Parto, Wilkins, and Morosko—won judgments against Corhart on the theory of strict liability. Those judgments were based principally upon certain admissions made by Corhart and upon the testimony of Albert Rush, Jr. In its separate cross-appeal, Corhart argues that (1) the court erred in refusing to strike Mr. Rush's testimony and (2) with or without that testimony, the evidence was insufficient to establish exposure by the plaintiffs to any asbestos-containing product manufactured, sold, or supplied by Corhart. Part of the plaintiffs' response to the first of these complaints is that Corhart failed to preserve it for appellate review.

### A. *Rush's Testimony*

Each of the plaintiffs, during their employment with Bethlehem, worked at Open Hearth Furnace No. 4 in various capacities. That is not disputed by Corhart. Rush, a bricklayer, also worked at Open Hearth No. 4. He recalled using Corhart bricks at that site: "The name was stamped right on the brick. Right on top of the bricks, C–O–R–H–A–R–T, name was right on the brick. It was stamped."

There was no evidence that these bricks themselves contained asbestos. The problem, according to Mr. Rush, was that the heat from the furnaces caused the bricks to expand and contract, eventually leaving spaces between them that led to a loss of heat. To fill those spaces, the workmen

used asbestos strips. On direct examination, he stated that the Corhart bricks had the asbestos strips glued to them: "The strips were glued to the sides of this brick, and on some of them it had strip on the sides and on the bottom part." He was quite certain that "they were asbestos strips."

On cross-examination, Rush said that, in the early 1960's, the bricks were not delivered to the jobsite with the strips already attached—that the strips were supplied separately and that the workmen cut the strips and put them on the bricks. Beginning in the mid or late 1960's, he continued, the bricks came to the jobsite with the strips already glued to them. When asked whether he had personal knowledge that the strips were asbestos, this colloquy ensued:

"A Well at that time we were told it was the brick with asbestos strips. We always called it asbestos.

Q So somebody told you that?

A Definitely, foreman on job or wouldn't know what to do.

Q In other words what you are telling me is you were told?

A Oh, yes, yes.

Q The brick, no matter what kind of brick it was that was sent to Bethlehem Steel, were sent there on and specifications that Bethlehem Steel issued, isn't that correct?

A To the best of my knowledge.

Q Okay."

We are informed that "[a]t the outset of these proceedings, the Defendants objected to any attempt by the Plaintiffs' witnesses to characterize products as containing asbestos, unless these characterizations were based on personal knowledge of the witness" and that those objections were overruled "based on the assumption that the Plaintiffs would prove, by independent corroborating evidence, that the products being testified about did, in fact contain asbestos." For whatever reason, Corhart neglected to include

these early objections in the record. We assume from context that they were in the nature of motions *in limine,* which the court denied.

No objection was made to Mr. Rush's testimony when it was given; nor, despite his response on cross-examination, was any contemporaneous motion made to strike it. Not until 10 trial days after the completion of the testimony did Corhart, as part of its motion for judgment at the end of the plaintiffs' case, move to strike the testimony on the ground of lack of personal knowledge. The court denied the motion.

Corhart continues to complain that Rush's testimony was based on hearsay and should have been stricken. It is a complaint that is not properly before us. Md.Rule 2–517(a) requires that an objection to the admission of evidence "be made at the time the evidence is offered or as soon thereafter as the grounds for objection become apparent. Otherwise, the objection is waived." A motion *in limine* to exclude evidence that is denied does not ordinarily eliminate the need to object when the offending evidence is offered. *Prout v. State,* 311 Md. 348, 356, 535 A.2d 445 (1988). Nor, under the circumstances evident here, do we regard as timely a motion to strike made 10 trial days after the basis for the motion has become apparent.

### B. *Sufficiency of Evidence*

Corhart's sufficiency argument arises from its challenge to the court's denial of its motion for judgment, made under Md.Rule 2–519. The test of evidentiary sufficiency in that context is well established. It is "whether the evidence serves to prove a fact or permits an inference of fact that could enable an ordinarily intelligent mind to draw a rational conclusion therefrom in support of the right of the plaintiff to recover." *Stein v. Overlook Joint Venture,* 246 Md. 75, 81, 227 A.2d 226 (1967); *Curley v. General Valet Service,* 270 Md. 248, 264, 311 A.2d 231 (1973); *Beahm v. Shortall,* 279 Md. 321, 342, 368 A.2d 1005 (1977). For that

purpose, the evidence and all reasonable inferences from it must be viewed in a light most favorable to the plaintiff.

Corhart does not contest, in this appeal, that the plaintiffs were exposed to whatever materials were used at Open Hearth No. 4 during the 1960's and 1970's. It urges that the evidence was legally insufficient to show that Corhart supplied any asbestos to which the plaintiffs were exposed.

Albert Rush's testimony sufficed to establish that bricks bearing Corhart's name were used at that jobsite and that, when delivered to the jobsite during that period, asbestos strips were glued to the bricks. In addition, the following admissions, made by Corhart as part of discovery, were read into the record:

(1) That "Corhart sold refractory brick to the Bethlehem Steel Sparrows Point steel plant on one or more occasions during the period from the end of the 1960's to approximately 1975 or 1976" but "[t]here was no asbestos contained *within* this Defendant's refractory products." (Emphasis added.)

(2) That Corhart "did provide asbestos strips with some of its refractory products in the late 1960's and early 70's at the request of and pursuant to the specifications of its customers."

(3) "Corhart asbestos was adhered or glued to the side of refractory brick from Nicolet Industries in Amber, Pennsylvania."

and

(4) Corhart "knew that asbestos containing products that [it] manufactured, sold and/or distributed would ... be used by bricklayers, ... be used by laborers, ... be used in areas where trades other than pipecoverers would be working, ... be used by or at Bethlehem Steel, and ... supplied at Bethlehem Steel."

These admissions, coupled with Rush's testimony, suffice to permit a rational jury reasonably to conclude that Corhart supplied the asbestos strips, either separately or glued

to the bricks, to which the plaintiffs were exposed while working in or near Open Hearth No. 4. We therefore find no error in the denial of Corhart's motion for judgment.

## V. SUMMARY OF CONCLUSIONS

Because of the automatic stays entered with respect to Eagle–Picher and Celotex, the judgments entered against those companies have not been addressed or ruled upon by us. For the reasons stated in Part IV of this Opinion, we find no invalidity in the verdicts rendered against Corhart. For the reasons stated in Part III B, we hold that, in determining what, if any, reductions should be made to those verdicts, only settlements made with, and releases given to, joint tortfeasors may be considered. For the reasons stated in Part III C, we conclude that the court erred in precluding participation by the plaintiffs in the proceeding from which the court determined who, among the settling defendants, were joint tortfeasors. For the reasons stated in Part III D, we further conclude that, given its findings that GAF and Quigley were not joint tortfeasors, the court erred in regarding the aggregate amounts paid to the plaintiffs by GAF, Quigley, and Keene as the consideration for the release.

By virtue of these latter two conclusions, it will be necessary for the circuit court to reconsider the question of which of the settling defendants were joint tortfeasors, to allow the plaintiffs to offer relevant evidence on that issue and to make appropriate argument, and to recalculate any reductions based on our holdings in Parts III B and III D. We shall therefore vacate the judgments entered against Corhart only to the extent of the reductions made to the verdicts entered by the jury, and remand those cases for further proceedings to determine the appropriate reductions.

JUDGMENTS AGAINST CORHART VACATED IN PART; CASES REMANDED TO CIRCUIT COURT FOR BALTIMORE COUNTY FOR FURTHER PROCEEDINGS

IN ACCORDANCE WITH THIS OPINION; APPELLANT CORHART TO PAY THE COSTS.