492 A.2d 1313

**CENTRAL GMC, INC.**

v.

**Roy S. HELMS et al.**

**No. 144, Sept. Term, 1984.**

Court of Appeals of Maryland.

June 6, 1985.

Motion for Reconsideration Denied July 11, 1985.

Robert J. Sher, Chevy Chase, for appellant.

Steven R. Migdal, Annapolis (Manis, Wilkinson, Snider and Goldsborough, Annapolis, on the brief), for appellees.

Argued before MURPHY, C.J., and SMITH, ELDRIDGE, COLE, RODOWSKY, COUCH and McAULIFFE, JJ.

SMITH, Judge.

We shall here hold that appellant, Central GMC, Inc., did not hold a garageman's lien on a garbage truck at the time it made sale of that truck under its purported lien. Hence, the trial judge properly entered judgment for appellee, Roy S. Helms, on his suit against Central for conversion of his truck.

## I

The facts are basically undisputed. In September 1978 Helms entered into a contract to purchase a used Kenworth garbage truck from Sanitation Specialists Company, Inc. The purchase price was $15,000. This sum was paid by Helms in September or October 1978.[1] At the time of the contract it was understood by both parties that the truck was to be tuned up or repaired prior to Helms' taking possession of it.

In October 1978 Sanitation delivered the truck to Central GMC for the necessary repairs. Nathiel Smith, president of Sanitation, explained that Central "did a tune-up and the truck failed before it got to Annapolis, Maryland. Had to be retowed to Central Motors." Ultimately, there was a complete engine overhaul at a cost of $7,042.36. The truck was re-delivered to Sanitation who delivered it to Helms in December 1978. At that time, Helms noted that further repairs were necessary. Sanitation re-delivered the vehicle to Central for those repairs. They were completed in January 1979 at a cost of $2,464.79.

These bills have not been paid. Smith indicated that prior to this incident he had done business with Central to the extent of "[m]any, many millions of dollars worth. Many millions," that he "had done business with Central GMC since they had been in business and before that with Eddie

---

**1.** At trial Helms testified to full payment in each of the two months. The point was not clarified. The sole witnesses were Helms and Nathiel Smith of Sanitation. Smith was not questioned as to the date of payment.

Cannon and Harold Hurwitz' father," a period covering "[m]ore than 20 [years]." Smith said that he "talked to Harold Hurwitz down there," stating:

"He was the gentleman we felt was mostly—as I said, we did millions of dollars with him and the problem was, the transmission never worked. If it was there I was not going to pay for something that was not operating. Mr. Helms called me and told [me] he couldn't get the truck to work. So I would be very foolish to pay them for something that wasn't working."

Smith indicated it was his intention to resolve the matter.

On January 12, 1979, Helms accepted delivery of the vehicle from Sanitation. At that time he received a bill of sale and a Maryland certificate of title. He obtained a Virginia title. Shortly thereafter Helms began experiencing problems with the truck and so notified Sanitation. Sanitation directed Helms to have the vehicle repaired at Blue Ridge Kenworth, Inc., located in Washington County, Virginia.

Difficulties with the truck persisted. On February 19, 1979, Helms towed the vehicle to Blue Ridge Kenworth. It never again was in his physical control.

In July 1979 Central learned of the fact that the vehicle was on the premises of Blue Ridge Kenworth. Central took possession of it. It notified Helms and Sanitation of the repossession and of its intention to dispose of the vehicle at public auction to satisfy its alleged garageman's lien. Helms and Sanitation each protested the proposed sale. In fact, Helms' attorney said, "We are today filing appropriate action in the Circuit Court of Smyth County against your company for the removal of Mr. Helms' vehicle and against Sanitation Specialist Company, Inc., for damages and recision of the purchase price." The sale was conducted on August 20, 1979.

Helms did in fact institute suit in Smyth County against Sanitation, Blue Ridge, and Central GMC. In due season a non-suit was entered, upon motion of Helms, against Cen-

tral GMC and Blue Ridge Kenworth. The suit against
Sanitation was based upon breach of warranty. Ultimately,
a settlement was effected by which Sanitation paid Helms
$15,000.00. Pursuant to agreement between Helms and
Sanitation, the judge of the Circuit Court of Smyth County
entered an order dismissing the action "with prejudice, but
without prejudice as concerns any suit of Roy S. Helms or
Sanitation Specialists Company, Inc. against Central GMC,
Inc."

Helms and Sanitation instituted a suit against Central
GMC, Inc., in the Circuit Court for Montgomery County.
This later was transferred to the Circuit Court for Prince
George's County. In count one Helms sought judgment "in
the amount of $16,400.00 compensatory damages, plus $50,-
000.00 punitive damages, plus interest and costs from July
5, 1979," against Central GMC for having "wrongfully and
without just cause or excuse removed the vehicle of the
Plaintiff from the Commonwealth of Virginia on or about
July 5, 1979," and then, "[d]espite notification from Plain-
tiff's attorney to Defendant regarding the wrongful repos-
session," having "wilfully, wantonly and maliciously sold
said vehicle in violation of Plaintiff's unencumbered title
thereto and wrongfully converted the proceeds of the sale
to its own use." In the second count Sanitation sought
contribution or indemnification from Central GMC.

The matter came on for trial without a jury. On the first
count the trial judge entered judgment in favor of Helms
against Central GMC in the amount of $15,000.00 compensa-
tory damages. On the second count judgment for costs was
entered in favor of Central GMC.

Central GMC entered an appeal to the Court of Special
Appeals. We issued a writ of certiorari, 302 Md. 239, 486
A.2d 1196, on our own motion prior to argument in the
intermediate appellate court.

## II

We summarize Central's contentions: Helms' relationship
to the garbage truck at the time Central's lien attached to it

was such that Central GMC's surrender of the truck did not discharge the lien as to Helms. In this regard it is first argued that Helms was the owner of the truck within the meaning of the Maryland mechanics' lien law at the time the lien attached. Then, it is contended that even if Helms was not the owner he had notice of the lien at the time of its creation. Central GMC also claims that it is entitled to a pro tanto credit against the judgment in the amount of the settlement previously reached between Helms and Sanitation Specialists. It bases this contention upon the Uniform Contribution Among Tort-Feasors Act, Maryland Code (1957) Art. 50, §§ 16–24. Finally, Central GMC contends that Helms' failure to avail himself of the statutory remedies provided by the mechanics' lien law bars his right to recover in this action. We shall discuss the points seriatim.

## III

■ This controversy arises under Code (1975) §§ 16–201 to −209, Commercial Law Article. Section 16–202(c) states in pertinent part:

"Any person who, with the consent of the owner, has custody of a motor vehicle and who, at the request of the owner, provides a service to or materials for the motor vehicle, has a lien on the motor vehicle for any charge incurred for any:

"(1) Repair or rebuilding;

"(2) . . .

"(3) . . . ." [2]

Section 16–203 provides that the lienor may retain possession of the property subject to the lien until the charges

---

**2.** In *Patapsco Trailer v. Eastern Freight.*, 271 Md. 558, 564, 318 A.2d 817, 820 (1974), Judge Levine stated for the Court, "[P]rior to the adoption of [Code (1957, 1972 Repl.Vol.) Art. 63,] § 41, [the then statute pertaining to garagemen's liens,] Maryland did recognize a common law lien in favor of an automobile repairman who furnished labor and materials," citing *Myers v. Auto Company*, 143 Md. 107, 121 A. 916 (1923), and *The Winton Co. v. Meister*, 133 Md. 318, 105 A. 301 (1918).

which give rise to the lien are paid or the lien is otherwise discharged in accordance with the Commercial Law Article. Pertinent to this case is § 16–204 which states:

"Surrender or delivery of the property subject to the lien discharges that lien against a third person who is without notice of the lien, but does not discharge the lien against the owner or against a third party who has notice of the lien."

As we have indicated, Central would have us hold that Helms was the owner of the vehicle at the time the garbage truck was delivered to Central for repairs. Hence, by its theory, the surrender of possession did not discharge the lien. In this regard Central GMC seizes upon the language of Code (1977) § 11–143, Transportation Article, defining owner as, among other things, "a person who has the property in or title to the vehicle, . . . ." arguing that Helms had "property in" the garbage truck in question. What it overlooks is that Code (1977) § 11–101, Transportation Article, relative to definitions, states, "In the Maryland Vehicle Law, the following words have the meanings indicated, unless the context requires otherwise." This controversy does not involve "Maryland Vehicle Law" which embraces Titles 11–27, Transportation Article. Hence, the definition in the Transportation Article is not applicable.

In this case the trial judge said:

"I am persuaded by a preponderance of the evidence that the parties' agreement did not include a change of ownership until title passed, and the title passed in January. That Mr. Helms never had any notice, actual or constructive, that there is a repair bill that was unpaid."

In *Govm't Employees Ins. v. Coppage,* 240 Md. 17, 212 A.2d 523 (1965), Judge Oppenheimer said for the Court:

"The Uniform Sales Act in effect at the time of the transaction here involved, Code (1957), Art. 83, § 36, provided in part as follows:

'1) Where there is a contract to sell specific or ascertained goods, the property in them is transferred to the buyer at such time as the parties to the contract intend it to be transferred.'

"Under the Act, as at common law, it is the expressed intention of the parties as to when title is to be transferred which governs. *Syriani v. Gebhart,* 195 Md. 69, 77, 72 A.2d 766 (1950). See also *Agri Mfg. Co. v. Atlantic Fer. Co.,* 129 Md. 42, 48, 98 Atl. 365 (1916); Williston on Sales rev. ed., § 410; Corbin on Contracts, § 30." 240 Md. at 22, 212 A.2d at 526.

The term "goods" is defined in Code (1975) § 2–105(1), Commercial Law Article, as meaning "all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale other than the money in which the price is to be paid ...." A motor vehicle comes within this definition. Hence, we conclude that the issue of when Helms became the owner of the vehicle in question is governed by the sales portion of the Maryland Uniform Commercial Code. Section 2–401, the statutory successor to Art. 83, § 36 cited in *Coppage,* provides in pertinent part, "[T]itle to goods passes from the seller to the buyer in any manner and on any conditions explicitly agreed on by the parties." It further states, "Unless otherwise explicitly agreed title passes to the buyer at the time and place at which the seller completes his performance with reference to the physical delivery of the goods ...." Given the statute and the finding of the trial judge, which was not clearly erroneous under Maryland Rule 886, we conclude that Helms became the owner of the vehicle in question when it was delivered to him together with its title on January 12, 1979. Hence, the surrender of the truck by Central GMC extinguished the lien unless Helms was "a third party who ha[d] notice of the lien." The cases relied upon by Central GMC for a contrary result are inapposite.

On the subject of notice Judge McSherry said for the Court in *Baltimore v. Whittington,* 78 Md. 231, 27 A. 984 (1893):

"Notice is of two kinds,—actual and constructive. Actual notice may be either express or implied. If the one, it is established by direct evidence, if the other, by the proof of circumstances from which it is inferable as a fact. Constructive notice is, on the other hand, always a presumption of law. Express notice embraces not only knowledge, but also that which is communicated by direct information, either written or oral, from those who are cognizant of the fact communicated. Wade on Notice, sec. 6. Implied notice, which is equally actual notice, arises where the party to be charged is shown to have had knowledge of such facts and circumstances as would lead him, by the exercise of due diligence, to a knowledge of the principal fact. 16 Am. & Eng. Ency. of Law, 790. Or, as defined by the Supreme Court of Missouri, in *Rhodes v. Outcalt,* 48 Mo. [367] 370, 'a notice is regarded in law as actual when the party sought to be affected by it knows of the particular fact, or is conscious of having the means of knowing it, although he may not employ the means in his possession for the purpose of gaining further information.' It is simply circumstantial evidence from which notice may be inferred. It differs from constructive notice, with which it is frequently confounded, and which it greatly resembles, in respect to the character of the inference upon which it rests; constructive notice being the creature of positive law, resting upon strictly legal presumptions which are not allowed to be controverted, 1 Story's Eq. sec. 399; *Townsend v. Little,* 109 U.S. 504 [3 S.Ct. 357, 27 L.Ed. 1012], whilst implied notice arises from inference of *fact. Williamson v. Brown,* 15 N.Y. 354; Wade on Notice, sec. 8." 78 Md. at 235–36, 27 A. at 985. (Emphasis in original.)

To similar effect see 1 M. Merrill, *Merrill on Notice* §§ 19 and 21 (1952).

■ There is not the slightest evidence in this case that Helms had express notice of Central GMC's lien on the garbage truck in question, nor is there evidence of facts and circumstances which would lead Helms by the exercise of due diligence to a knowledge of such lien so as to constitute implied notice. It is not incumbent upon every purchaser of a used motor vehicle from an established dealer to query that dealer as to when and where repairs may have been made on that vehicle and then to go make inquiry of the repairman as to whether his bill has been paid.

Concerning constructive notice, Merrill states in § 17:

"This is another term of variant meaning. Sometimes emphasis is placed upon the view that constructive notice is 'evidence of notice, the presumption of which is so violent that the court will not allow even of its being controverted'. Despite the popularity of this definition, its vagueness permits application to different situations. Thus it is used to denominate notice arising out of notification; such as by recordation of instruments of title; by publication; by posting; by lis pendens; by delivering, or by mailing, a letter; by possession of premises; by judicial proceedings to which one is a party. Emphasis upon the quality of irrebuttability, in the sense that a denial of knowledge does not defeat constructive notice, has led to the inclusion of notice arising from agent's knowledge and that growing out of inquiry-provoking facts. The matter is well summarized by Mr. Justice Davis: 'Law writers and judges frequently refer to any kind of imputed notice which is charged to another by reason of circumstances binding on him, whether actually known to him or not, as "constructive notice". In a broad sense the term "constructive notice" is frequently used in a loose way to describe what is in strictissimis verbis merely "implied notice" '. The term even has been used to describe the notice arising out of failure to perform a duty to acquire knowledge.

"It has been held that constructive notice may be employed to describe a rebuttable inference or implication of notice." 1 *Merrill on Notice* 13–15.

There is no evidence in this case of knowledge on the part of Helms or "of inquiry-provoking facts" known to Helms which would constitute constructive notice of the lien of Central GMC. Hence, it follows that the trial judge did not reach a clearly erroneous conclusion when he said, "Mr. Helms never had any notice, actual or constructive, that there is a repair bill that was unpaid."

## IV

■ As we have indicated, Central GMC claims that it is entitled to a pro tanto credit against Helms' judgment against Central in the amount of the settlement previously reached between Helms and Sanitation Specialists.[3] It bases this contention upon the Uniform Contribution Among Tort-Feasors Act, Code (1957) Art. 50, §§ 16–24. Through this act a statutory right of contribution among joint tort-feasors was created which did not exist at common law. *Baltimore Transit Co. v. State*, 183 Md. 674, 679, 39 A.2d 858, 860 (1944). For that Act to be applicable to the case at bar, Central GMC and Sanitation Specialists must be joint tort-feasors. The latter term is defined in § 16(a) as meaning "two or more persons jointly or severally liable in tort for the same injury to person or property, whether or not judgment has been recovered against all or some of them." The suits here were not for the same injury. Helms' suit against Sanitation Specialists arose out of the sale which we have held took place January 12, 1979. Helms sought to recover because the vehicle did not in his view meet the terms of the bargain. As we have already indicated, in his

---

**3.** At oral argument, in response to questions from the Court, counsel for Helms candidly said that this action was brought pursuant to agreement between Helms and Sanitation that Helms would bring suit for the benefit of Sanitation. The agreement is not a part of the record.

suit against Central GMC Helms claimed damages for the removal of his "vehicle ... from the Commonwealth of Virginia on or about July 5, 1979" and the subsequent sale thereof. He asserted that this sale was a "violation of [Helms'] unencumbered title" and that Central GMC "wrongfully converted the proceeds of the sale to its own use." In other words, the claim of Helms against Sanitation Specialists was to recover for the failure of the vehicle to measure up to its bargained for condition while the claim against Central GMC was for the conversion of the vehicle to the use of Central GMC, even in its less than bargained for condition. These two injuries simply are not the *same* injury. Accordingly, there can be no claim under the Uniform Contribution Among Tort-Feasors Act.

## V

■ The statutory remedies of which Central GMC contends Helms should have availed himself are found in § 16–206. Section 16–206(a)(1) provides:

> "If the owner of property subject to a lien disputes any part of the charge for which the lien is claimed, he may institute appropriate judicial proceedings."

Section 16–206(b)(1) states:

> "If the owner of property subject to a lien disputes any part of the charge for which the lien is claimed, he immediately may repossess his property by filing a corporate bond for double the amount of the charge claimed."

When Central GMC took possession of the garbage truck in question from the premises of Blue Ridge Kenworth that vehicle was no longer subject to Central's lien. This is because of the provisions of § 16–204 pertaining to surrender of possession which we discussed in III. We have held that Helms was neither an owner within the purview of § 16–204 nor a third party with notice of the lien. It follows, therefore, that these statutory remedies were not applicable to Helms.

278

JUDGMENT AFFIRMED; APPELLANT TO PAY THE COSTS.