982 A.2d 818

**Shoaib HASHMI**

v.

**Troy BENNETT, et al.**

**No. 258, Sept. Term, 2007.**

Court of Special Appeals of Maryland.

Oct. 28, 2009.

436

David J. McManus (Baxter, Baker, Sidle, Conn & Jones, PA on the brief), Baltimore, for appellant.

Julia A. Lodowski (Emily C. Malarkey, E. Dale Adkins, III, Salsbury Clements, Bekman, Marder & Adkins, LLC on the brief), Baltimore, for appellee.

Panel: HOLLANDER, JAMES R. EYLER, and WOODWARD, JJ.

WOODWARD, J.

This appeal arises from the death of twenty-seven year old Adrian Tyree Bennett ("Adrian") from septic shock on April 23, 2003. A jury sitting in the Circuit Court for Baltimore City found that appellant, Shoaib A. Hashmi, M.D., was negligent in his care and treatment of Adrian and that his negligence caused Adrian's death. On October 25, 2006, the court entered judgment on the verdict against appellant and in favor of appellees, Troy Bennett, as Personal Representative of Adrian's estate and as Adrian's father; Geraldine Bennett, as Adrian's mother; and Keion Bennett, Tyshaun Bennett, and Adam Gross, as Adrian's children, in the total amount of $2,295,000. Upon motion of appellant, the court applied the provisions of Maryland Code (1973, 2006 Repl.Vol.), Section 11–108 of the Courts and Judicial Proceedings Article ("C.J.") and reduced the judgment to $1,795,000. Appellant then moved to further reduce the judgment, claiming entitlement to additional reduction under the Maryland Uniform Contribution Among Joint Tort–Feasors Act ("UCATA"), C.J. §§ 3–1401 *et seq.* Because appellees had entered into two settlement agreements with other defendants, the circuit court, on March 20, 2007, reduced the judgment by two-thirds to $598,-333.333.

On appeal, appellant presents one question for our review, which we have rephrased:

Did the trial court err by reducing the judgment against appellant by two-thirds, instead of four-fifths, under UCATA?

For the following reasons, we shall affirm the judgment of the circuit court.

## BACKGROUND

On November 16, 2005, by a First Amended Complaint and Election for Jury Trial, appellees filed a survival and wrongful death action against Stephen Holtzclaw, M.D., Roman Kostrubiak, M.D., Emergency Physician Associates of Maryland, P.C. ("E.P.A."), appellant, and The Good Samaritan Hospital of Maryland, Inc. ("Good Samaritan"). Appellees alleged that the defendants negligently failed to diagnose and appropriately treat a methicillin-resistant staphylococcus aureus infection that the decedent had developed before he went to the Good Samaritan emergency room on April 22, 2003. As a result of the defendants' negligence, according to appellees, Adrian went into severe septic shock and died on April 23, 2003.

Dr. Holtzclaw was dismissed without prejudice from the lawsuit on June 21, 2006. On October 10, 2006, Dr. Kostrubiak, E.P.A., and Good Samaritan were dismissed with prejudice pursuant to settlement agreements.[1] As part of settlement, the settling defendants agreed to execute joint tortfeasor releases. Appellees were paid $400,000 by E.P.A. and Dr. Kostrubiak, its employee physician, and $550,000 by Good Samaritan.

A jury trial commenced on October 16, 2006, against appellant as the only remaining defendant. The jury found appellant negligent in his care and treatment of Adrian and that his negligence was a cause of Adrian's death. As noted, on October 25, 2006, the court granted judgment on the verdict against appellant and in favor of appellees in the total amount of $2,295,000, and reduced the judgment to $1,795,000, pursuant to the statutory cap on non-economic damages set forth in C.J. § 11–108.

---

1. Dr. Hotzclaw was also dismissed with prejudice, but without a settlement agreement.

Thereafter, appellant moved to further reduce the verdict,[2] claiming entitlement to additional reduction under UCATA. Appellant argued that the E.P.A. release created one joint-tortfeasor share for E.P.A. and its employee, Dr. Kostrubiak. Regarding the Good Samaritan release, appellant contended that there were three joint-tortfeasor shares, *i.e.*, one share for each of Good Samaritan's three employees, Dr. Hina Sahi, Nurse Kathleen Bosse, and an unidentified emergency room nurse, "Nurse A." In combination with appellant's share as a joint tortfeasor, appellant calculated a total of five shares, and thus argued that he was entitled to a four-fifths *pro rata* reduction of the verdict.

Appellees agreed with appellant that the E.P.A. release created one joint-tortfeasor share for E.P.A. and its employee, Dr. Kostrubiak. Appellees, however, contended that the Good Samaritan release produced only one joint-tortfeasor share, rather than three. According to appellees, a total of three joint-tortfeasor shares were present in the instant case—one for appellant, one for E.P.A./Kostrubiak, and one for Good Samaritan, resulting in a two-thirds reduction of the jury verdict.

On March 15, 2007, a hearing was held on appellant's post-trial motions. On March 20, 2007, the court reduced the judgment by two-thirds, instead of four-fifths. Accordingly, judgment was entered in the amount of $598,333.333 ($1,795,-000 ÷ 3 = $598,333.333), representing the amount of appellant's one-third joint-tortfeasor share.

Appellant timely noted this appeal on April 13, 2007.

## DISCUSSION

Appellant argues that the language used in the Good Samaritan release "establishes that Good Samaritan Hospital accounts for three joint-tortfeasor shares, one for each of its

---

2. Although appellant's motion sought to reduce the verdict, the motion was, in reality, to reduce the judgment, as the court had already entered judgment on the jury's verdict. *See* Md. Rules 2–532 to 2–535.

three allegedly negligent employees, Dr. Sahi, Nurse Bosse, and Nurse A." Appellant maintains that "[t]he Good Samaritan Release, read as a whole, shows that the parties intended to release not only the corporate entity[, Good Samaritan], but the individual employee actors whose care was at issue." According to appellant, each negligent employee, along with Good Samaritan, constitutes a joint tortfeasor. Thus appellant contends that the trial court should have reduced the verdict by dividing it by five shares, rather than three shares.

Appellees argue that appellant is "not entitled to *multiple-share reductions of the verdict for Good Samaritan agents unnamed in the [Good Samaritan settlement] Release.*" The basis of appellees' argument is that appellant is not entitled to additional share reductions of the verdict because appellant "waived the defense of release, and failed to establish multiple Good Samaritan joint-tortfeasor shares by any of the mechanisms available to him under Maryland law."

At common law, Maryland courts refused to recognize a right of contribution among joint tortfeasors. *Parler & Wobber v. Miles & Stockbridge, P.C.,* 359 Md. 671, 683, 756 A.2d 526 (2000). "[A] release by the injured party of one of several joint tortfeasors released all." *Swigert v. Welk,* 213 Md. 613, 619, 133 A.2d 428 (1957). In 1941, Maryland enacted UCATA to establish " 'a statutory right of contribution' " among joint tortfeasors, *Parler & Wobber,* 359 Md. at 685, 756 A.2d 526 (quoting *Central GMC, Inc. v. Helms,* 303 Md. 266, 276, 492 A.2d 1313 (1985)), thereby "enabling an individual to settle with one joint tortfeasor and still have recourse against the remaining tortfeasors." *Anne Arundel Med. Ctr., Inc. v. Condon,* 102 Md.App. 408, 415, 649 A.2d 1189 (1994); *see also Jacobs v. Flynn,* 131 Md.App. 342, 369, 749 A.2d 174 (2000) (noting that UCATA was enacted "to encourage settlements by allowing a plaintiff to maintain his claim against a non-settling joint tort-feasor when he settles with another joint tort-feasor and signs a release").

■ When an injured person settles with a joint tortfeasor, UCATA prescribes the effect of a settlement release on the

injured person's claims against other joint tortfeasors. UCA-TA § 3–1404 provides that a joint tortfeasor release reduces the injured person's claim against all non-settling joint tortfeasors. *See Jones v. Hurst,* 54 Md.App. 607, 608, 459 A.2d 219 (1983) ("Under the [UCATA], certain consequences ensue when an injured person releases one of several joint tortfeasors. One of those consequences may be a reduction in any judgment the injured party recovers against remaining tortfeasor(s)."). Specifically, § 3–1404 states:

A release by the injured person of one joint tort-feasor, whether before or after judgment, does not discharge the other joint tortfeasors unless the release so provides, but it reduces the claim against the other joint tort-feasors in the amount of the consideration paid for the release or in any amount or proportion by which the release provides that the total claim shall be reduced, if greater than the consideration paid.

"Ascertaining the number of joint tort-feasors, therefore, is critical in determining the amount by which the jury award must be reduced before judgment is entered." *Jacobs,* 131 Md.App. at 370, 749 A.2d 174.

## I.

## The Number of Joint Tortfeasors

In the instant case, the issue before this Court is the effect of the releases given by appellees to E.P.A./Kostrubiak and to Good Samaritan on the judgment entered against appellant. *See Martinez v. Lopez,* 300 Md. 91, 96, 476 A.2d 197 (1984). That effect, namely a reduction of the verdict against appellant, is determined by the number of released parties that are, in fact, joint tortfeasors. *See Collier v. Eagle–Picher Indus., Inc.,* 86 Md.App. 38, 56, 585 A.2d 256 ("[O]nly releases given *to joint tortfeasors* will give rise to rights of reduction and contribution." (Emphasis added)), *cert. denied,* 323 Md. 33, 591 A.2d 249 (1991). *Jones,* 54 Md.App. at 608, 459 A.2d 219 (stating that UCATA § 3–1404, formerly § 19, "do[es] not come into play unless the person released was a joint tort-

feasor"). Appellant, as the party moving for a reduction of the verdict in accordance with UCATA § 3–1404, bears the burden of proving the joint tortfeasor status of the settling parties. *See, e.g., Swigert,* 213 Md. at 619, 133 A.2d 428 ("[U]nder Maryland law . . ., in order for [a non-settling defendant] to be certain that he will obtain these reductions, it is necessary that negligence on the part of [a settling defendant] contributing to the injuries must be shown in one manner or another.").

 UCATA defines "[j]oint tort-feasors" as "two or more persons jointly or severally liable in tort for the same injury to person or property, whether or not judgment has been recovered against all or some of them." UCATA § 3–1401(c). "The fact . . . that a party has been sued or threatened with suit is not enough to establish joint tort-feasor status." *Jacobs,* 131 Md.App. at 374, 749 A.2d 174. Nor is one "considered a joint tort-feasor . . . merely because he or she enters a settlement and pays money." *Id.* UCATA "does not specify the test of liability. Clearly, something short of an actual judgment will suffice. . . ." *Swigert,* 213 Md. at 619, 133 A.2d 428.

 In discussing the determination of joint tortfeasor status in *Collier,* we explained:

> Where a plaintiff has, at some time, claimed that two or more persons have contributed to his injury by their respective tortious conduct, two questions may arise: (1) whether the conduct of those persons falls within the scope of the definition and (2) how that determination is to be made. Where no settlements have occurred, the liability of all such persons is ordinarily determined by the trier of fact, and so both questions are answered by the verdicts. That pertains as well in those cases where one or more settlements have occurred but the liability of the settling defendants, but for the settlements, is nonetheless submitted to and determined by the trier of fact.
>
> **The problems arise, most frequently, where the actual liability of the settling defendant is not determined by the trier of fact. Resort then is made, at least initially,**

to the language of the release. In some instances, the settling parties specify in the release that the releasee is to be regarded as a joint tortfeasor, even though he may disclaim liability. In that event, the releasee's status as a joint tortfeasor is contractually determined. Conversely, the settling parties may specify in the release that the releasee shall not be regarded as a joint tortfeasor unless adjudicated as such, in which event the releasee will be regarded as a mere volunteer [3] absent a judicial determination of his liability.

*Collier,* 86 Md.App. at 57, 585 A.2d 256 (citations omitted) (emphasis added).

 Thus joint tortfeasor status may be established by (1) a judicial determination that a settling party is a joint tortfeasor, or (2) an admission or concession of joint tortfeasor status.[4] *See Jacobs,* 131 Md.App. at 374–75, 749 A.2d 174 ("Tort-feasor status, in the absence of adjudication, generally

---

**3.** A volunteer is a party that obtains a release from judgment when not, in fact, liable to the plaintiff. *See Collier v. Eagle–Picher Indus., Inc.,* 86 Md.App. 38, 56, 585 A.2d 256, *cert. denied,* 323 Md. 33, 591 A.2d 249 (1991).

Where the settling parties specify in the release that the settling party shall not be considered a joint tortfeasor, monies paid on account of such settlement will be considered merely volunteer payments; a non-settling defendant judicially determined to be liable will not be entitled to a reduction of the damages awarded against it on account of the consideration paid by the settling party.
*Jacobs v. Flynn,* 131 Md.App. 342, 375, 749 A.2d 174 (2000).

**4.** In the instant appeal, Good Samaritan filed an amicus brief, in which it contends that a non-settling defendant may prove the joint tortfeasor status of released parties in three ways. The non-settling defendant "may submit to the court that some or all of the released parties have been (1) adjudicated to be joint tortfeasors; (2) deemed to be joint tortfeasors in accord with *Jones v. Hurst,* [54 Md.App. 607, 459 A.2d 219 (1983)]; or (3) determined to be joint tortfeasors by 'something short of an actual judgment[.]' " For examples of the third category, Good Samaritan cites to *Owens–Illinois v. Cook,* 386 Md. 468, 872 A.2d 969 (2005) (a default judgment establishes joint tortfeasor status of the party against whom the judgment is taken) and to *Collier,* 86 Md.App. at 38, 585 A.2d 256 (post-trial proceedings can be employed by the court to determine the joint tortfeasor status of a party to an ambiguous release). Because appellant's argument in this appeal relies solely on

rests on admission by the purported tort-feasor of such status. Thus, a party will be considered a joint tort-feasor when it admits joint tort-feasor status in a settlement agreement, or if a default judgment has been entered against a party." (Citations omitted)). An example of the first category can be found in *Swigert*. There, the Court of Appeals concluded that the trial court should not have granted a motion for summary judgment in favor of Welk, a third party defendant, where, although the plaintiff executed a release of Welk pre-trial, Welk's status as a joint tortfeasor was denied in the release.[5] *Swigert*, 213 Md. at 615, 618, 622, 133 A.2d 428. To prevent "a somewhat incongruous procedural situation to have a party to a case completely dismissed and leave the question of his negligence yet to be determined," the Court decided that Welk was to remain in the case as a third party defendant, and the question of Welk's tortfeasor status was to be answered by judicial determination. *Id.* at 621–22, 133 A.2d 428.

*Jones* presented the alternative to judicial determination of joint tortfeasor status. 54 Md.App. at 608–09, 459 A.2d 219. *Jones* arose out of an automobile accident between Jones, the appellant, and Zachary Hurst, who operated the vehicle that struck Jones. *Id.* at 609, 459 A.2d 219. Jones sued Zachary Hurst and Henry Hurst, the owner of the vehicle, and General Motors Corporation ("G.M."), the manufacturer of the Hurst vehicle. *Id.* Jones settled with G.M. and executed a "Joint Tortfeasor Release" with G.M. *Id.* at 609, 459 A.2d 219. Following trial, a verdict of $18,000 was rendered against Zachary Hurst and in favor of Jones.[6] *Id.* at 610, 459 A.2d

---

the interpretation of the Good Samaritan release, we need not express an opinion on Good Samaritan's synthesis of the case law.

**5.** *Swigert* involved a two-car collision, occurring while the plaintiff, Newport, was riding in the car of defendant, Swigert, at night, and Swigert allegedly failed to turn on his headlights. *Swigert*, 213 Md. at 615, 133 A.2d 428. Swigert impleaded Welk, who was driving the other vehicle, as a third party defendant for the purpose of obtaining contribution. *Id.* at 615, 133 A.2d 428.

**6.** "Following the close of evidence, a verdict was directed in favor of Henry Hurst." *Jones*, 54 Md.App. at 610, 459 A.2d 219.

219. Upon Zachary Hurst's motion, pursuant to the G.M. release and UCATA § 3–1404 (formerly § 19), the trial judge reduced the judgment against Zachary Hurst by one-half, to $9,000. *Id.* On appeal, we rejected Jones' argument that the verdict should not have been reduced because G.M.'s liability had never been judicially determined. *Id.* at 611, 459 A.2d 219. Although noting that the release also contained an express denial of G.M.'s liability, we concluded that the language in the release conceding G.M.'s joint tortfeasor status was sufficient to satisfy UCATA's requirement of establishing a party's joint tortfeasor status. *Id.* The release stated: "for the purpose of determining the amount of any judgments that may be recovered by me against any person, firm or corporation, except General Motors ... the said General Motors Corporation shall be considered as joint tort-feasors [sic] to the same extent and effect as if judgments had been rendered against them [sic] as joint tort-feasors." *Id.* (alterations in original).

In the case *sub judice*, appellant concedes that he never sought a judicial determination of joint tortfeasor status of Good Samaritan's three employees. Instead, appellant urges that he "sought a reduction based upon the language of the releases." In determining joint tortfeasor status, "problems arise, most frequently, where the actual liability of the settling defendant is *not* determined by the trier of fact" and the court resorts "at least initially, to the language of the release." *Collier,* 86 Md.App. at 57, 585 A.2d 256 (emphasis in original).

## II.

## The Good Samaritan Release

When "the settling parties specify in the release that the releasee is to be regarded as a joint tortfeasor," then "the releasee's status as a joint tortfeasor is contractually determined." *Collier,* 86 Md.App. at 57, 585 A.2d 256. "Maryland follows the objective law of contract interpretation and construction." *Owens–Illinois, Inc. v. Cook,* 386 Md. 468, 496, 872 A.2d 969 (2005).

"A court construing an agreement under this test must first determine from the language of the agreement itself what a reasonable person in the position of the parties would have meant at the time it was effectuated. In addition, when the language of the contract is plain and unambiguous there is no room for construction, and a court must presume that the parties meant what they expressed. In these circumstances, the true test of what is meant is not what the parties to the contract intended it to mean, but what a reasonable person in the position of the parties would have thought it meant. Consequently, the clear and unambiguous language of an agreement will not give away [sic] to what the parties thought that the agreement meant or intended it to mean.... As a result, when the contractual language is clear and unambiguous, and in the absence of fraud, duress, or mistake, parol evidence is not admissible to show the intention of the parties or to vary, alter, or contradict the terms of that contract."

*Id.* at 496–97, 872 A.2d 969 (alteration in original) (quoting *Gen. Motors Acceptance Corp. v. Daniels*, 303 Md. 254, 261, 492 A.2d 1306 (1985)).

In the case *sub judice*, the Good Samaritan Release states in relevant part:

### RECITALS

A. Plaintiffs filed a Statement of Claim in the Health Claims Arbitration Office of Maryland, HCA No.2005–418 naming, among other parties, Good Samaritan Hospital of Maryland, Inc., as a Defendant Health Care Provider and alleging negligent tortious acts and omissions by the parties named in the Statement of Claim. The claim was waived out of Health Claims Arbitration and, on or about September 8, 2005, Plaintiffs filed a Complaint, Case No. 24–C–05–008202 OT in the Circuit Court for Baltimore City (the "Complaint").

B. The Releasing Parties identified herein and Good Samaritan Hospital of Maryland, Inc. ONLY desire to enter

into this Settlement Agreement in order to provide for certain payments in full settlement and discharge of any and all claims which are or might have been the subject of the aforesaid Statement of Claim and Complaint against the Released Party identified herein on the terms and conditions set forth herein. . . .

## SECTION I

### *Definitions*

\* \* \*

2. The term *"Released Party" or "Releasee"* includes Good Samaritan Hospital of Maryland, Inc., and any partner, agent (actual or apparent), servant, employee, consultant, staff, or representative of the above named individual and entity, and its successors, predecessors, affiliates, principals, heirs, devisees, executors, assigns and insurers as well as all attending, resident or consulting physicians, nurses, nurse practitioners, therapists, aides, technicians, or other health care providers. The term "Released Party" does not include Shoaib Hashmi, M.D., the non-settling Defendant or any other Defendants who may have entered into separate Settlement Agreements or Releases with the Releasing Parties.

\* \* \*

## SECTION IV

### *Other Claims*

1. If a lawsuit is filed or a claim otherwise made, including claims already made, by the *Releasing Parties* against any other person, firm, professional association or corporation other than a party released under this Settlement Agreement, the *Releasing Parties* hereby irrevocably consent that said claims against any party not released by this Settlement Agreement shall be reduced to the extent of the pro rata shares of the *Released Party* or the amount paid for this Settlement Agreement, whichever is greater, pursu-

ant to [UCATA], that such reduction shall occur whether or not any or all of the parties released under this Settlement Agreement are determined to be joint tortfeasors with the parties not so released, and that this Settlement Agreement may be introduced into evidence before any tribunal by any party in order to establish consent to the reduction pursuant to that Act. For purposes of this paragraph, the Released Party shall be deemed to be a Joint Tortfeasor, jointly and severally liable to the Undersigned, to the same extent as if the Released Party had been adjudicated to be a Joint Tortfeasor by a final judgment of a court of record after trial on the merits.

(Underlined in original).

Appellant argues that the language of the Good Samaritan release "establishes that Good Samaritan [ ] accounts for three joint-tortfeasor shares, one each for its three allegedly negligent employees, Dr. Sahi, Nurse Bosse, and Nurse A." In support of its argument, appellant relies on the "broad definition of who is released by its terms," specifically the definition of "Released Party" or "Releasee" as

includ[ing] Good Samaritan Hospital of Maryland, Inc., and any partner, agent (actual or apparent), servant, employee, consultant, staff, or representative of the above named individual and entity, and its successors, predecessors, affiliates, principals, heirs, devisees, executors, assigns and insurers as well as all attending, resident or consulting physicians, nurses, nurse practitioners, therapists, aides, technicians, or other health care providers.

This all-inclusive language, appellant contends, indicates that appellees and Good Samaritan contemplated the release of multiple individual actors, not solely the release of Good Samaritan as a corporate entity.

Appellant further argues that the Good Samaritan release "uses plural language" in incorporating UCATA's verdict reduction principles. Appellant points to the use of the terms "claims," "shares," and "parties released" in the following language of the release:

> [T]he *Releasing Parties* hereby irrevocably consent that said *claims* against any party not released by this Settlement Agreement shall be reduced to the extent of the pro rata *shares* of the *Released Party* or the amount paid for this Settlement Agreement, whichever is greater, pursuant to [UCATA], that such reduction shall occur whether or not any or all of *the parties released* under this Settlement Agreement are determined to be joint tortfeasors with the parties not so released, . . . .

(Emphasis added by appellant).

Use of these plural terms, appellant posits—"especially the plural term 'shares'—suggests that Good Samaritan['s] [*pro-rata*] reduction can include more than the single share that [a]ppellees urge." Finally, appellant argues that the language used in the release "specifies that the reduction can be applied whether or not all the parties released are determined to be joint tortfeasors, establishing that [a]ppellees were consenting to multiple reductions in the release document."

Appellees counter that "[t]he clear and unambiguous intent of the Release was to establish **one** joint tortfeasor share." (Bold added by appellees). In so arguing, appellees emphasize that the Good Samaritan release, by its terms, "deems" that Good Samaritan is to be considered "*a* **Joint Tortfeasor**" to the same extent as if Good Samaritan had been adjudicated "*a* **Joint Tortfeasor.**" (Bold and underline added by appellees). Appellees acknowledge the "all-inclusive definition of Released Party," but note that "nowhere in the Release is it established[ ] which specific agent was liable or that the magnitude of Good Samaritan's *pro rata* share is three." In other words, according to appellees, the release does not specify "how many Good Samaritan agents are to be counted as joint tortfeasors in determining *pro rata* shares."

■ In the instant case, the status of Good Samaritan as a joint tortfeasor is conceded, and thus the verdict must be reduced by a *pro rata* share attributable to Good Samaritan. *See* UCATA § 3–1404. But before we reach the issue of whether a further reduction in the verdict is required for *pro*

*rata* shares attributable to certain agents or employees of Good Samaritan, appellant has the burden of establishing the joint tortfeasor status of such agents or employees, namely, Dr. Sahi, Nurse Bosse, and Nurse A. *See Swigert,* 213 Md. at 619, 133 A.2d 428; *Jones,* 54 Md.App. at 608, 459 A.2d 219. As previously stated, appellant contends that he has satisfied this burden by virtue of the language of the Good Samaritan release. We disagree and explain.

In our view, the language of the Good Samaritan release is clear and unambiguous. The Good Samaritan release is entitled "Settlement Agreement and Release" and provides that "[t]he Releasing Parties identified herein and Good Samaritan Hospital of Maryland, Inc. ONLY desire to enter into this Settlement Agreement. . . ." Thus the only parties to the settlement agreement are appellees and Good Samaritan. Writing for this Court in *Jacobs,* Judge Sally Adkins, now a member of the Court of Appeals, stated that "[j]oint tortfeasor status is determined by application of [UCATA], and an agreement could only determine joint tort-feasor status of one who was a party thereto." 131 Md.App. at 371, 749 A.2d 174. Accordingly, Dr. Sahi, Nurse Bosse, and Nurse A, as nonparties to the settlement agreement, could not attain joint tortfeasor status. *See id.*

Even if they could be deemed joint tortfeasors by agreement of appellees and Good Samaritan, the Good Samaritan release never specifically identified Dr. Sahi, Nurse Bosse, or Nurse A as a "Released Party" or "a Joint Tortfeasor." Indeed, the only party expressly named as a "Released Party" is Good Samaritan, and the release provides that "the Released Party shall be deemed *a* Joint Tortfeasor . . . to the same extent as if the Released Party had been adjudicated to be *a* Joint Tortfeasor by the final judgment of a court of record after trial on the merits." (Emphasis added).

The fact that Dr. Sahi, Nurse Bosse, and Nurse A are members of a class of individuals (*e.g.,* "employee," "staff," "resident . . . physician[ ]," or "nurse") who are included in the definition of a "Released Party" does not, *ipso facto,* make

them joint tortfeasors. At the hearing before the circuit court on appellant's motion to reduce the verdict under the provisions of UCATA, appellees' counsel advised the court that Good Samaritan had 2,301 employees, which included "people who were never involved in this case." Counsel then rhetorically asked the court: "Does that mean we get 2,301 shares for the hospital because all of the employees are now considered joint tort[f]easors?" The answer is clearly "no," because such construction of the language of the release would be, using appellees' term, "ludicrous."

Appellees' counsel went on to argue to the trial court:

In order to have a joint [tortfeasor] status, and receive the reduction under [UCATA], there is only one of two ways that can happen. You have to . . . admit that you are a joint [tortfeasor] by the language of the release or you have to have judicial determination, . . . . **There is no admission that [Dr.] Sahi, Bosse or this Nurse,** I don't even know who [appellant's counsel] is talking about, **were [tortfeasors], they don't admit to being [tortfeasors] in this release, their names never appear[ ] in this release, they were never parties.**

(Emphasis added).

We agree that there is no admission or other statement in the Good Samaritan release that Dr. Sahi, Nurse Bosse, and Nurse A are deemed to be joint tortfeasors. The plain language of the release identifies no one, other than Good Samaritan, as a joint tortfeasor. Accordingly, appellant has failed to satisfy his burden of establishing that Dr. Sahi, Nurse Bosse, and Nurse A were joint tortfeasors, and thus appellant was not entitled to a reduction in the jury's verdict for *pro rata* shares attributable to those individuals.

 Even assuming, as appellant claims, that, in Section IV of the Good Samaritan release quoted above, the use of the singular term "a Joint Tortfeasor" with the plural terms "claims," "shares," and "parties released" renders the Good Samaritan release ambiguous, we reach the same conclusion.

Appellant insists that "parol evidence can be consulted to reconcile any ambiguity." The "undisputed parol evidence" offered by appellant is (1) "expert designation letters prepared by [a]ppellees' counsel alleging negligence on the part of" Dr. Sahi, Nurse Bosse, and Nurse A, and (2) "sworn deposition transcripts from three of [a]ppellees' own expert witnesses to the same effect."

If a contract, including a release, is ambiguous, parol evidence may be consulted to show the intent of the parties at the time that the contract was created. *Anne Arundel County v. Crofton Corp.*, 286 Md. 666, 673–74, 410 A.2d 228 (1980). The critical time is when the contract was entered into by the parties. *Id.* at 673, 410 A.2d 228. The expert witness designation letter was prepared seven months before the creation of the Good Samaritan release, and the testimony of the expert witnesses was also taken months earlier. Such evidence failed to establish any intent by appellees or Good Samaritan to designate Dr. Sahi, Nurse Bosse, and Nurse A as three joint tortfeasors *at the time that the release was executed.* Indeed, the only "evidence" of intent was a statement by appellees' counsel to the trial court that the "intent of the parties" was for Good Samaritan and its employees to be one share.

In addition, appellant's parol evidence regarding Nurse Bosse and Nurse A failed to establish that they were joint tortfeasors. For Nurse Bosse, appellees' experts testified that she breached the standard of care, but never opined that such breach was a cause of Adrian's death. Nurse A was never identified; the expert testimony was simply that the hospital *staff* delayed administering antibiotics, and "[t]here really is not a lot of detail about what that time lapse was all about, *whether that was a nursing issue, whether that was a physician issue,* . . . ." (Emphasis added).

Thus appellant's "parol evidence" failed to establish the joint tortfeasor status of Dr. Sahi, Nurse Bosse, or Nurse A in the release. Accordingly, no *pro rata* shares can be

attributed to these individuals for the purpose of reducing the jury's verdict against appellant.[7]

### III.

### *Pro Rata* Shares Attributable to the Good Samaritan and E.P.A. Releases

As noted above, UCATA § 3–1404 provides that, where a plaintiff releases a joint tortfeasor, the verdict against another joint tortfeasor shall be reduced by the amount paid or by any proportion that the settlement release provides, if greater than the amount paid. Where, as here, a release provides for a *pro rata* reduction, we determine the number of *pro rata* shares based on the number of joint tortfeasors. First, appellant was adjudicated liable and therefore constitutes one joint tortfeasor. Second, in *Chilcote v. Von Der Ahe Van Lines,* 300 Md. 106, 121–22, 476 A.2d 204 (1984), the Court of Appeals held that, where a party is deemed a joint tortfeasor as a result of being vicariously liable for the negligent conduct of its agent, then the principal and agent together comprise one joint-tortfeasor share for the purpose of reduction. Consequently, both appellant and appellees agree that E.P.A. and its employee, Dr. Kostrubiak, together form one joint tortfeasor. Finally, having determined that there is one joint tortfeasor attributable to Good Samaritan, the total number of joint tortfeasors is three. Thus the number of *pro rata* shares is three. Accordingly, the trial court did not err in reducing the judgment against appellant by two-thirds.

---

**7.** As additional support for his contention that Good Samaritan's release encompasses more than one joint-tortfeasor share, appellant argues that, because Good Samaritan paid $550,000 for its release and E.P.A. paid $400,000 for its release, "[t]his suggests that Good Samaritan Hospital had greater exposure, a logical conclusion to reach if more than one actor at Good Samaritan Hospital was potentially responsible." We do not discern, nor can we reasonably infer, from a comparison of the amount of consideration paid for the Good Samaritan and E.P.A. releases that Good Samaritan's release accounts for more than one joint-tortfeasor share, much less precisely three shares.

JUDGMENT OF THE CIRCUIT COURT FOR BALTI-MORE CITY AFFIRMED; APPELLANT TO PAY COSTS.