7 A.3d 1059

**Shoaib HASHMI**

**v.**

**Troy BENNETT, et al.**

**No. 15, Sept. Term, 2010.**

Court of Appeals of Maryland.

Nov. 3, 2010.

708

David J. McManus (Siobhan R. Keenan of Baxter, Baker, Sidle, Conn & Jones, P.A., Baltimore, MD), on brief, for petitioner.

Julia Arfaa (Emily C. Malarkey and E. Dale Adkins III of Salsbury, Clements, Bekman, Marder & Adkins, LLC, Baltimore, MD), on brief, for respondents.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, MURPHY, BARBERA and JOHN C. ELDRIDGE (Retired, specially assigned), JJ.

BATTAGLIA, J.

We are asked to consider whether, in a medical malpractice action, a judgment entered after a jury trial against a negligent tort-feasor,[1] already reduced by a settlement entered into with a hospital corporation, with an attendant release, may be further diminished by requesting a "judicial determination" of negligence against three employees of the hospital, who were never joined as parties in the action. In so doing, we are faced with the following questions on certiorari, *Hashmi v. Bennett*, 412 Md. 494, 988 A.2d 1008 (2010), which we have renumbered:

---

**1.** The spelling of the word "tortfeasor," as Judge John C. Eldridge observed in *Owens–Corning Fiberglas v. Garrett*, 343 Md. 500, 530 n. 13, 682 A.2d 1143, 1158 n. 13 (1996), is a complex question. "The Maryland Code uses the hyphenated form 'tort-feasor,' while other sources have omitted the hyphen. Out of deference to the Legislature, we shall adopt the hyphen, except where quoting from a nonhyphenating source." *Id.*

I. What are the standards for interpreting a joint tort-feasor release in favor of a hospital with multiple allegedly negligent employees or agents?

II. What are the standards for determining how many joint tort-feasors properly should be attributed to a hospital whose liability is vicarious only for the actions of its employees and agents?

III. What procedural recourse does a non-settling defendant have to challenge the allocation of joint tort-feasor shares made in a joint tort-feasor release in favor of a co-defendant hospital with multiple allegedly negligent employees or agents?

We shall hold that the release of the hospital clearly and unambiguously encompasses all of its employees and agents; we shall further hold that a "judicial determination" of joint tort-feasor status of employees of the releasing hospital after the conclusion of all proceedings in the case, when they were never joined as defendants or cross-defendants, is impermissible.

On September 8, 2005, Troy Bennett, Geraldine Bennett, Keion Bennett, Tyshaun Bennett, and Adam Gross, Respondents, (hereinafter "the Bennetts") filed a survival and wrongful death action in the Circuit Court for Baltimore City against Emergency Physician Associates of Maryland, P.C., Shoaib A. Hashmi, M.D., and The Good Samaritan Hospital of Maryland, Inc., in connection with the death of twenty-seven year old Adrian Tyree Bennett from septic shock. Subsequently, on November 16, 2005, by a First Amended Complaint and Election for Jury Trial, Respondents joined Roman Kostrubiak, M.D. as a defendant.

The Bennetts asserted that the health care providers failed to diagnose and appropriately treat Adrian's methicillin-resistant staphylococcus aureus infection,[2] alleging the following:

---

**2.** Methicillin resistant staphylococcus aureus, or MRSA, is a strain of bacteria "resistant to most antibiotics and is usually acquired in hospitals or nursing homes, spread from patient to patient by contaminated

9. At all times hereinafter set forth, the Defendant, Roman Kostrubiak, M.D., (hereinafter "Kostrubiak") was an agent and/or apparent agent, servant, or employee of Defendants, Emergency Physician Associates, P.C., and The Good Samaritan Hospital of Maryland, Inc. (hereinafter "Good Samaritan Hospital").

10. At all times hereinafter set forth, the Defendant, Shoaib Hashmi, M.D., (hereinafter "Hashmi") was an agent and/or apparent agent, servant, or employee of the Defendant, Good Samaritan Hospital.

11. On or about April 22, 2003, at approximately, 3:15 p.m., twenty-seven year old Adrian Bennett presented to the Good Samaritan Hospital with a chief complaint of nausea, vomiting, generalized weakness and a bump on the head.

\* \* \*

14. At or about 7:30 p.m., Defendant, Kostrubiak discharged Adrian from the emergency room and admitted him to the hospital under the service of Defendant, Hashmi. At that time, pneumonia and gastroenteritis were on his differential diagnosis. Defendant Kostrubiak ordered Adrian Bennett to be placed on respiratory isolation.

15. At or about 2:30 a.m., Adrian Bennett was transferred to the medical floor of the hospital. Defendant Hashmi was Adrian's attending physician at the time. Defendant Hashmi failed to recognize Adrian's progressive septic state and treat same on the night of April 22 and through the morning of April 23, 2003.

16. At or about 4:00 a.m. on April 23, Adrian Bennett was administered a dose of Unasyn. On or about 10 a.m. on April 23, Adrian Bennett was administered his first dose of Vancomycin and Ceftriaxone.

17. Periodically, throughout the early morning hours of April 23, 2003, Adrian was seen by the nurses. During this

---

hands, clothing, and equipment." Taber's Cyclopedic Medical Dictionary 2194 (21st ed.2009).

time, Adrian continued to demonstrate signs of progressive sepsis.

18. The nurses called a resident physician, Dr. Sahi, at approximately 4 a.m. concerning Adrian's then-condition. Dr. Sahi prescribed Ambien in response to the call.

19. The nurses did not call any health care provider from 7:30 p.m. on April 22 until 4 a.m. on April 23.

20. At or around 9:30 a.m., Adrian received medical attention for his sepsis (from medical physicians) for the first time. By this time, Adrian was suffering from severe septic shock.

21. At or about 12:45 p.m., Adrian Bennett was pronounced dead after several rounds of cardiopulmonary resuscitation.

The Bennetts alleged that Dr. Kostrubiak negligently misdiagnosed and mistreated Adrian's infection:

23. The Defendant, Roman Kostrubiak, M.D., was negligent and careless in the following respects:

    a. failed to properly and timely diagnose Adrian Bennett's infection in the ER;

    b. failed to adequately treat Adrian Bennett's infection in the ER;

    c. failed to call in appropriate and timely consults;

    d. failed to have Adrian Bennett admitted to the ICU;

    e. failed to order appropriate studies; and

    f. was otherwise negligent and careless.

The Bennetts further alleged that Dr. Hashmi breached applicable standards of care:

24. The Defendant, Shoaib Hashmi, M.D. was negligent and careless in the following respects:

    a. failed to properly and timely diagnose Adrian Bennett's septic state;

    b. failed to timely and adequately treat Adrian Bennett's septic state;

    c. failed to call in appropriate consults;

d. failed to timely assess Adrian Bennett;

e. failed to order appropriate studies;

f. failed to place Adrian Bennett in the ICU; and

g. was otherwise negligent and careless.

Finally, the Bennetts alleged that Good Samaritan Hospital failed to timely diagnose and adequately treat Adrian's infection and sepsis:

25. The Defendant, Good Samaritan Hospital, was negligent and careless in the following respects:

a. failed to timely and adequately monitor and assess Adrian Bennett on the evening of April 22 and throughout the early morning of April 23;

b. failed to timely call appropriate physicians for medical assistance on April 22 and April 23;

c. failed to appropriately respond to nursing calls which were made;

d. failed to properly and timely diagnose Adrian Bennett's infection and septic state;

e. failed to timely and adequately treat Adrian Bennett's infection and septic state;

f. failed to call in appropriate consults;

g. failed to order appropriate tests;

h. failed to timely recommend transfer to the critical care unit;

i. failed to timely assess Adrian Bennett; and

j. was otherwise negligent and careless.

Dr. Kostrubiak along with Emergency Physician Associates of Maryland answered, as did Good Samaritan Hospital, generally denying liability, and asserting affirmative defenses including contributory negligence and assumption of risk. Dr. Hashmi also answered, generally denying liability and asserting contributory negligence and assumption of risk as affirmative defenses.

On October 10, 2006, the complaints against Dr. Kostrubiak and Emergency Physician Associates of Maryland, as well as Good Samaritan Hospital, were dismissed with prejudice as a result of separate settlements,[3] in accordance with Rule 2–506(a).[4] The Bennetts executed a "Joint Tortfeasor Release," discharging all claims against Emergency Physician Associates of Maryland and its employee, Dr. Kostrubiak, in exchange for $400,000.[5]

The Good Samaritan "Settlement Agreement and Release," [6] at issue in the present case, provided, in relevant part:

### RECITALS

A. Plaintiffs filed a Statement of Claim in the Health Claims Arbitration Office of Maryland, HCA No.2005–418 naming, among other parties, Good Samaritan Hospital of Maryland, Inc., as a Defendant Health Care Provider and alleging negligent tortious acts and omissions by the parties named in the Statement of Claim. The claim was waived out of Health Claims Arbitration and, on or about September 8, 2005, Plaintiffs filed a Complaint, Case No. 24–C–05–008202 OT in the Circuit Court for Baltimore City (the "Complaint").

---

**3.** Claims against another physician defendant were also dismissed with prejudice pursuant to the Stipulation of Dismissal.

**4.** Rule 2–506, governing voluntary dismissal, states, in relevant part:

(a) **By notice of dismissal or stipulation.** Except as otherwise provided in these rules or by statute, a party who has filed a complaint, counterclaim, cross-claim, or third-party claim may dismiss all or part of the claim without leave of court by filing (1) a notice of dismissal at any time before the adverse party files an answer or (2) by filing a stipulation of dismissal signed by all parties to the claim being dismissed.

**5.** The terms of the "Joint Tortfeasor Release" discharging Emergency Physician Associates of Maryland and Dr. Kostrubiak are not in issue in the present case.

**6.** Respondents received $550,000 from Good Samaritan in consideration for executing the "Settlement Agreement and Release."

B. The Releasing Parties identified herein and Good Samaritan Hospital of Maryland, Inc. ONLY desire to enter into this Settlement Agreement in order to provide for certain payments in full settlement and discharge of any and all claims which are or might have been the subject of the aforesaid Statement of Claim and Complaint against the Released Party identified herein on the terms and conditions set forth herein. . . .

## SECTION I

### *Definitions*

\*   \*   \*

2. The term *"Released Party" or "Releasee"* includes Good Samaritan Hospital of Maryland, Inc., and any partner, agent (actual or apparent), servant, employee, consultant, staff, or representative of the above named individual and entity, and its successors, predecessors, affiliates, principals, heirs, devisees, executors, assigns and insurers as well as all attending, resident or consulting physicians, nurses, nurse practitioners, therapists, aides, technicians, or other health care providers. The [t]erm "Released Party" does not include Shoaib Hashmi, M.D., the non-settling Defendant or any other Defendants who may have entered into separate Settlement Agreements or Releases with the Releasing Parties.

\*   \*   \*

## SECTION IV

### *Other Claims*

1. If a lawsuit is filed or a claim otherwise made, including claims already made, by the *Releasing Parties* against any other person, firm, professional association or corporation other than a released party released under this Settlement Agreement, the *Releasing Parties* hereby irrevocably consent that said claims against any party not released by this

Settlement Agreement shall be reduced to the extent of the pro rata shares of the *Released Party* or the amount paid for this Settlement Agreement, whichever is greater, pursuant to the Maryland Uniform Contribution Among Tortfeasors [sic] Act (codified in Maryland Code Annotated, Cts. & Jud. Proc. Art. § 3–1401, et seq. (2002 Repl.Vol.)[) ], that such reduction shall occur whether or not any or all of the parties released under this Settlement Agreement are determined to be joint tortfeasors with the parties not so released, and that this Settlement Agreement may be introduced into evidence before any tribunal by any party in order to establish consent to the reduction pursuant to that Act. For purposes of this paragraph, the Released Party shall be deemed to be a Joint Tortfeasor, jointly and severally liable to the Undersigned, to the same extent as if the Released Party has been adjudicated to be a Joint Tortfeasor by a final judgment of a court of record after trial on the merits.

Dr. Hashmi, however, did not settle, nor did he file any third-party claim alleging that another party's negligence contributed to Adrian's death.[7] During the one-week trial that ensued regarding the claims against him, moreover, Dr. Hashmi did not implicate any other Good Samaritan Hospital employee or any one else as responsible for Adrian's allegedly deficient care and subsequent death. The jury returned a verdict in favor of the Bennetts, and the verdict sheet provided as follows, regarding Dr. Hashmi's liability:

1. Did Plaintiffs prove by a preponderance of the evidence that Dr. Hashmi was negligent in the course of his care of Adrian Bennett?

---

7. Rule 2–332, concerning third-party practice, states in relevant part: (a) **Defendant's claim against third party.** A defendant, as a third-party plaintiff, may cause a summons and complaint, together with a copy of all pleadings, scheduling notices, court orders, and other papers previously filed in the action, to be served upon a person not previously a party to the action who is or may be liable to the defendant for all or part of a plaintiff's claim against the defendant. A person so served becomes a third-party defendant.

YES

If you answered "NO" to Question 1, STOP.

If you answered "YES" to Question 1, GO TO Question 2.

2.   Did Plaintiff prove by a preponderance of the evidence that Dr. Hashmi's negligence in the course of his care of Adrian Bennett was a cause of Mr. Bennett's injuries and death on April 23, 2003?

YES

Judgment was entered on the verdict against Dr. Hashmi in the amount of $2,295,000, although he, thereafter, filed a "Motion for Remittitur or to Reduce the Verdict," asserting that the total verdict exceeded the statutory cap on noneconomic damages established in Section 11–108 of the Courts and Judicial Proceedings Article, Maryland Code (1973, 2006 Repl.Vol.).[8]   He also filed a "Supplemental Memorandum in Support of Motion to Reduce Verdict," claiming entitlement to an additional reduction, pursuant to the Maryland Contribution Among Joint Tort–Feasors Act.[9] In this regard, he asserted that he was entitled to contribution under the Act, not only from Emergency Physician Associates of Maryland and Dr. Kostrubiak, as well as Good Samaritan Hospital, but also from

---

**8.**   Section 11–108 of the Courts and Judicial Proceedings Article, Maryland Code (1973, 2006 Repl.Vol.), provides a cap on noneconomic damages in personal injury actions and states, in relevant part:

(b) *Limitation on amount of damages established.*

(1) In any action for damages for personal injury in which the cause of action arises on or after July 1, 1986, an award for noneconomic damages may not exceed $350,000.

(2)(i) Except as provided in paragraph (3)(ii) of this subsection, in any action for damages for personal injury or wrongful death in which the cause of action arises on or after October 1, 1994, an award for noneconomic damages may not exceed $500,000.

All references to Section 11–108 throughout are to the Courts and Judicial Proceedings Article, Maryland Code (1973, 2006 Repl.Vol.), unless otherwise noted.

**9.**   Sections 3–1401 *et seq.* of the Courts and Judicial Proceedings Article, Maryland Code (1973, 2006 Repl.Vol.). All references to "the Act" throughout are to Sections 3–1401 *et seq.* of the Courts and Judicial Proceedings Article, Maryland Code (1973, 2006 Repl.Vol.), unless otherwise noted.

"[t]hree distinct actors employed by Good Samaritan Hospital," namely (1) Dr. Hina Sahi, a hospital resident; [10] (2) Nurse Kathleen Bosse, a hospital floor nurse; [11] and (3) an unidenti-

---

10. Dr. Hashmi attached as an exhibit to his "Supplemental Memorandum in Support of Motion to Reduce Verdict," the Bennetts's expert designation letters of Dr. Warren Summer and Dr. Matthew Parker, concerning Dr. Sahi's alleged negligence. Dr. Summer's letter stated, in part:

> With respect to Dr. Sahi, Dr. Summer will testify that Dr. Sahi breached the standard of care by: (a) failing to recognize the severity of Mr. Bennett's condition; (b) failing to appreciate his septic state required immediate critical care therapy (including but not limited to, constant monitoring of vital signs in an ICU bed, the immediate administration of IV Vancomycin, the immediate administration of fluid resuscitation as appropriate (goal oriented therapy and more than 125 cc/hr as ordered), antipyretic medications, central lines, vasopressor support, etc.); (c) failing to appropriately monitor Mr. Bennett throughout the evening; and (d) failing to provide accurate information to Dr. Hashmi concerning Mr. Bennett's state in order for Dr. Hashmi to provide appropriate therapy to Mr. Bennett.

Dr. Parker's letter also provided:

> Dr. Parker will be called at trial to offer opinions against Dr. Hashmi, Dr. Sahi and possibly the floor nurses (depending on what is said in the depositions of the floor nurses). Although Dr. Parker reserves the right to make his opinions more specific (since Dr. Hashmi has not yet been deposed), Dr. Parker will testify at trial, based upon what he has reviewed to date, that Drs. Hashmi and Sahi breached the standard of care in their care and treatment of Adrian Bennett on April 22–23, 2003 by: (a) failing to timely diagnose his sepsis; (b) failing to timely recognize the severity of his sepsis; (c) failing to see Mr. Bennett immediately when called from the ER; (d) failing to place Mr. Bennett immediately in an ICU with intensive care and telemetry monitoring after being called from the ER; (e) failing to make appropriate orders for his sepsis; (f) failing to appropriately treat Mr. Bennett's sepsis; and (g) failing to place him on IV Vancomycin; and (h) negligently causing his death.

11. Attached to Dr. Hashmi's Supplemental Motion were also excerpts of deposition testimony from Dr. Summer and Dr. Michael Rosenberg, the Bennetts's experts, regarding Nurse Bosse's alleged breaches of the standards of care. Dr. Summer testified as follows:

> [Counsel]: I would include the nurses in the medical providers. [Dr. Summer]: Well, me too. So I think—I think the nursing performance was below standard. And I said that several times. By not calling the doctor at 2:15 or 2:30 or whenever she admitted that patient and took those vital signs. And, you know, give her another ten minutes to read his orders that said, you know, call when the pulse is more than 120. So that's a provider violation.

Dr. Rosenberg also testified:

fied emergency room nurse, Nurse A.[12]

The Bennetts resisted the reduction by three more "shares"[13] by countering that the alleged joint tort-feasors, Dr. Sahi, Nurse Bosse, and Nurse A, "were never named as defendants, never admitted liability to Plaintiffs, and never were found liable to Plaintiffs by a court or jury" and posited

---

[Counsel]: Do you have any standard of care opinions about any of the nurses at Good Samaritan Hospital?

[Dr. Rosenberg]: Well, I do. I'm not a nurse. But again, after dealing with nurses for a long time, I think they have an obligation and a responsibility to the patient. And I think that if they know of something that should happen or that isn't happening that should happen, that they have an obligation to make someone aware.

There's always a standard—an a—there's always someone that they can go to talk to, you know, if they feel that a patient is not getting the care that they should. And in this case I think that Cathleen—what's it Bosse or Bossu?

[Counsel]: Bosse?

[Dr. Rosenberg]: Bosse. Cathleen Bosse was the nurse on the floor. I—here are my issues with her. She had no documentation on this patient between 2:00 o'clock and 5:00 o'clock. And at some point she noted at about 3:00 o'clock the vital signs, and they were significantly different than the vital signs in the ER, I think she had the obligation to tell the resident about it or call D[r.] Hashmi....

12. Dr. Hashmi also attached as an exhibit to his Supplemental Memorandum deposition testimony from the Bennetts's expert, Dr. Hugh West, concerning the alleged negligence of an unidentified emergency room nurse, Nurse A:

[Counsel]: Do you have opinions against the nursing staff?

[Dr. West]: I do.

[Counsel]: What are those opinions?

[Dr. West]: The primary opinion ... is that there was a six hour and ten minute delay from the order of the antibiotics until the antibiotics were administered. So the Rocephin was administered at 2340 and I have a record that it was ordered at 1730, and a six hour plus delay in the administration of antibiotics to a patient with sepsis is not appropriate....

13. By "shares," we refer to the pro rata portion of a judgment attributable to each joint tort-feasor pursuant to the Act. *See Lahocki v. Contee Sand & Gravel Co., Inc.,* 41 Md.App. 579, 616, 398 A.2d 490, 511 (1979), *rev'd on other grounds,* 286 Md. 714, 410 A.2d 1039 (1980) ("[T]he burden of the judgment is distributed among the joint tortfeasors in numerical shares or proportions based upon the actual number of tortfeasors."); *see also Jones v. Hurst,* 54 Md.App. 607, 608, 459 A.2d 219, 220 (1983).

that the clear and unambiguous language of the Good Samaritan Release contemplated only one joint tort-feasor.

After a hearing, Judge Kaye A. Allison reduced the judgment to $1,795,000, pursuant to the statutory cap on noneconomic damages set forth in Section 11–108 of the Courts and Judicial Proceedings Article. With respect to the issue of increasing the contribution Dr. Hashmi was to receive from the three alleged joint tort-feasors, Judge Allison determined that the $1.7 million verdict would be divided among Emergency Physician Associates along with Dr. Kostrubiak, Good Samaritan Hospital, as well as Dr. Hashmi, for three shares rather than five shares, calculated on the basis of the three Good Samaritan employees, Dr. Kostrubiak along with Emergency Physician Associates, and Dr. Hashmi. Accordingly, judgment was entered against Dr. Hashmi in the amount of $598,333.33, representing his one-third joint tort-feasor share.

Dr. Hashmi appealed to the Court of Special Appeals, and our colleagues on the intermediate appellate court affirmed in a reported opinion, *Hashmi v. Bennett*, 188 Md.App. 434, 982 A.2d 818 (2009), reasoning that the language of the Good Samaritan Release clearly and unambiguously identified Good Samaritan Hospital as the joint tort-feasor and that "Dr. Sahi, Nurse Bosse, and Nurse A, as non-parties to the settlement agreement, could not attain joint tortfeasor status." *Id.* at 451, 982 A.2d at 828.

**Discussion**

When multiple tort-feasors cause harm to an injured party, the issue arises as to whether one of them may be held liable for all of the negligence, or whether each tort-feasor may individually be held responsible in a proportionate or equal manner for the injury. The right of contribution among negligent joint tort-feasors was not recognized at common law, so that a single tort-feasor could bear the entirety of the loss sustained by the injured party. 1 Stuart M. Speiser, Charles F. Krause, & Alfred W. Gans, The American Law of Torts § 3:15 (2003); *see also* William L. Prosser, Law of Torts 305–07 (4th ed.1971). The right of "contribution," in contrast,

enables a tort-feasor "to collect from joint tortfeasors when—and to the extent that—the tortfeasor has paid more than his or her proportionate share to the injured party." Black's Law Dictionary 378 (9th ed.2009).

The common law rule endured criticism for foisting the entire obligation on one tort-feasor, rather than "achieving equal or proportionate distribution of the common burden," and was abrogated in many states, including Maryland, by the enactment of the Uniform Contribution Among Tortfeasors Act, promulgated by the National Conference of Commissioners on Uniform State Laws in 1939. Unif. Contribution Among Joint Tortfeasors Act, Prefatory Note, 12 U.L.A. 196 (2008). The Act was developed to promote "some common policy" to legislatively establish contribution among joint tort-feasors. *Id.*

Section 3–1401 of the Act defines "joint tort-feasors" as follows:

(c) *Joint tort-feasors.*—"Joint tort-feasors" means two or more persons jointly or severally liable in tort for the same injury to person or property, whether or not judgment has been recovered against all or some of them.

Section 3–1402 codifies the right of contribution among joint tort-feasors, providing:

(a) *In general.*—The right of contribution exists among joint tort-feasors.

(b) *Discharge of liability or payment of share.*—A joint tort-feasor is not entitled to a money judgment for contribution until the joint tort-feasor has by payment discharged the common liability or has paid more than a pro rata share of the common liability.

Section 3–1403 abrogates the prior rule, in which the recovery of a judgment against one joint tort-feasor discharged any other joint tort-feasors:

The recovery of a judgment by the injured person against one joint tort-feasor does not discharge the other joint tort-feasor.

Section 3–1404 describes the effect of a release on nonsettling joint tort-feasors, namely reducing the claim either "in the amount of the consideration paid" or the "proportion by which the release provides":

A release by the injured person of one joint tort-feasor, whether before or after judgment, does not discharge the other tort-feasors unless the release so provides, but it reduces the claim against the other tort-feasors in the amount of the consideration paid for the release or in any amount or proportion by which the release provides that the total claim shall be reduced, if greater than the consideration paid.

Section 3–1405 states that a release of one joint tort-feasor may extinguish the right of contribution, so long as the release provides for a reduction in any recovery by the injured party of the pro rata share of the released tort-feasor:

A release by the injured person of one joint tort-feasor does not relieve the joint tort-feasor from liability to make contribution to another joint tort-feasor unless the release:

(1) Is given before the right of the other tort-feasor to secure a money judgment for contribution has accrued; and

(2) Provides for a reduction, to the extent of the pro rata share of the released tort-feasor, of the injured person's damages recoverable against all other tort-feasors.

In the context of these contribution statutory provisions, Dr. Hashmi, not a party to the Good Samaritan Release, claims that the Release language is ambiguous, because it refers to multiple hospital employees and agents in defining "Released Party" or "Releasee." As a result, Dr. Hashmi contends that the Release actually refers to three distinct joint tort-feasors, namely Dr. Sahi, Nurse Bosse, and Nurse A. The Bennetts, who were parties to the Release, counter that the Release unambiguously refers to Good Samaritan Hospital as "a Joint Tortfeasor" and that Dr. Hashmi "never proved (or even attempted to prove) ... that any specific Good Samaritan agents were separate individual joint tortfeasors, i.e. were negligent and caused Mr. Bennett's death."

■ In construing the Good Samaritan Release, we resort to principles of contract interpretation. *Owens–Illinois, Inc. v. Cook,* 386 Md. 468, 496, 872 A.2d 969, 985 (2005). The principle of the objective interpretation of contracts governs, *Clancy v. King,* 405 Md. 541, 557, 954 A.2d 1092, 1101 (2008), quoting *Cochran v. Norkunas,* 398 Md. 1, 16, 919 A.2d 700, 710 (2007), so that if a release is clear and unambiguous, "there is no room for construction, and a court must presume that the parties meant what they expressed." *Cook,* 386 Md. at 496, 872 A.2d at 985 (citation omitted). "Under the objective law of contract interpretation, the court will give force and effect to the words of the contract without regard to what the parties to the contract thought it meant or what they intended it to mean." *Langston v. Langston,* 366 Md. 490, 507, 784 A.2d 1086, 1095 (2001). Our task when interpreting a contract is to "[d]etermine from the language of the agreement itself what a reasonable person in the position of the parties would have meant at the time it was effectuated." *Calomiris v. Woods,* 353 Md. 425, 436, 727 A.2d 358, 363 (1999) (citation omitted).

Dr. Hashmi emphasizes that the definition of "Released Party" or "Releasee" in Section I encompasses all hospital employees and agents, with the exception of himself, as follows:

> The term *"Released Party" or "Releasee"* includes Good Samaritan Hospital of Maryland, Inc., and any partner, agent (actual or apparent), servant, employee, consultant, staff, or representative of the above named individual and entity, and its successors, predecessors, affiliates, principals, heirs, devisees, executors, assigns and insurers as well as all attending, resident or consulting physicians, nurses, nurse practitioners, therapists, aides, technicians, or other health care providers. The [t]erm "Released Party" does not include Shoaib Hashmi, M.D., the non-settling Defendant or any other Defendants who may have entered into separate Settlement Agreements or Releases with the Releasing Parties.

As a result, he contends, the Release language is ambiguous regarding whether a single joint tort-feasor share or multiple shares for Dr. Sahi, Nurse Bosse, and Nurse A are included.

In contrast, the Bennetts highlight the language of Section IV of the Release, which identifies Good Samaritan Hospital as "a Joint Tortfeasor," as follows:

If a lawsuit is filed or a claim otherwise made, including claims already made, by the *Releasing Parties* against any other person, firm, professional association or corporation other than a released party released under this Settlement Agreement, the *Releasing Parties* hereby irrevocably consent that said claims against any party not released by this Settlement Agreement shall be reduced to the extent of the pro rata shares of the *Released Party* or the amount paid for this Settlement Agreement, whichever is greater, pursuant to the Maryland Uniform Contribution Among Tortfeasors [sic] Act (codified in Maryland Code Annotated, Cts. & Jud. Proc. Art. § 3–1401, et seq. (2002 Repl.Vol.)[) ] . . . . For purposes of this paragraph, the Released Party shall be deemed to be a Joint Tortfeasor, jointly and severally liable to the Undersigned, to the same extent as if the Released Party has been adjudicated to be a Joint Tortfeasor by a final judgment of a court of record after trial on the merits.

It is true that Section I defines "Released Party" or "Releasee" globally, releasing all employees and agents of Good Samaritan Hospital, with the exception of Dr. Hashmi. Section IV, however, identifies Good Samaritan Hospital, the "Released Party" as "a Joint Tortfeasor," such that the Release both broadly encompasses hospital employees and agents, while nevertheless representing one joint tort-feasor share.

Our interpretation comports with that of our colleagues on the intermediate appellate court, who determined that the Release clearly and unambiguously identifies Good Samaritan Hospital only as "a joint tort-feasor." As the Court of Special Appeals aptly noted, "an agreement could only determine joint tort-feasor status of one who was a party thereto," 188 Md.

App. at 451, 982 A.2d at 828, quoting *Jacobs v. Flynn,* 131 Md.App. 342, 371, 749 A.2d 174, 189 (2000), and only the Bennetts and Good Samaritan Hospital were parties to the Release. Thus, we decline to embrace Dr. Hashmi's tortured analysis, as the Release contains no admission or other statement that Dr. Sahi, Nurse Bosse, or Nurse A are deemed to be joint tort-feasors.[14]

Even if we were to determine that the Good Samaritan Release was ambiguous, we would not countenance the separate, post-trial proceeding Dr. Hashmi proposes, in which he suggests that the proffer of evidence in a separate post-judgment judicial proceeding against Dr. Sahi, Nurse Bosse, and Nurse A, who are not parties to the action, would be sufficient to establish their status as joint tort-feasors in order to reduce his contribution to the adjudicated verdict.[15] None of the three Good Samaritan employees was named as a

---

**14.** In a related argument, Dr. Hashmi cites *Chilcote v. Von Der Ahe Van Lines,* 300 Md. 106, 476 A.2d 204 (1984), *Anne Arundel Medical Center, Inc. v. Condon,* 102 Md.App. 408, 649 A.2d 1189 (1994), *Rivera v. Prince George's County Health Department,* 102 Md.App. 456, 649 A.2d 1212 (1994), *cert. denied,* 338 Md. 117, 656 A.2d 772 (1995), as well as myriad cases from other jurisdictions, for the proposition that "the agent and his principals are not joint tort-feasors under [the Act]." As a result, Dr. Hashmi contends, Good Samaritan Hospital entered into the Release agreement "to eliminate the claim that it was vicariously liable for the direct wrongdoing of its employees, Dr. Sahi, Nurse Bosse, and Nurse A." The fact remains, nevertheless, that there is no admission or statement in the Release indicating that Dr. Sahi, Nurse Bosse, or Nurse A are joint tort-feasors. Rather, the Release encompasses all Good Samaritan employees and agents, with the exception of Dr. Hashmi, while identifying only Good Samaritan Hospital as a joint tort-feasor.

**15.** In a similar vein, Dr. Hashmi asserts that a post-hoc "judicial determination" furthers judicial efficiency, because were he to pursue contribution claims against Dr. Sahi, Nurse Bosse, and Nurse A, the terms of the Release provide that the Bennetts must indemnify Good Samaritan Hospital for any claim "arising from the underlying claim." In this regard, Dr. Hashmi refers us to *Reedon of Faribault, Inc. v. Fidelity and Guaranty Insurance Underwriters, Inc.,* 418 N.W.2d 488 (Minn.1988), *J & J Timber Co. v. Broome,* 932 So.2d 1 (Miss.2006), and *Horejsi v. Anderson,* 353 N.W.2d 316 (N.D.1984). We need not consider this argument, however, because no claims for contribution have been filed by Dr. Hashmi.

defendant in the original action, nor did Dr. Hashmi join them as third-party defendants pursuant to Rule 2–332(a), which provides:

> (a) **Defendant's claim against third party.** A defendant, as a third-party plaintiff, may cause a summons and complaint, together with a copy of all pleadings, scheduling notices, court orders, and other papers previously filed in the action, to be served upon a person not previously a party to the action who is or may be liable to the defendant for all or part of a plaintiff's claim against the defendant. A person so served becomes a third-party defendant.

Rather than pursue a "judicial determination" countenanced by our Rules, Dr. Hashmi, in an effort to increase the number of joint tort-feasor shares, thereby reducing his share of the judgment, seeks to demonstrate that Dr. Sahi, Nurse Bosse, and Nurse A were also negligent in a collateral, post-judgment proceeding, without Dr. Sahi, Nurse Bosse and Nurse A being notified or even necessarily being present or defending.[16]

[6] Never has this Court, or as far as we can tell, any other court, permitted this type of "judicial determination" of joint tort-feasor status, without their having been joined as

---

**16.** Dr. Hashmi refers us to *Healthcare Staffing Solutions, Inc. v. Wilkinson*, 5 So.3d 726 (Fla.Dist.Ct.App.2009), as support for the notion that the negligence of Dr. Sahi, Nurse Bosse, and Nurse A may be "judicially determined" in a post-trial proceeding. In *Wilkinson*, an injured patient filed a medical malpractice claim against University Medical Center ("UMC") and Florida Board of Regents ("FBOR") regarding a misdiagnosis of her life-threatening heart condition. *Id.* at 728–29. UMC filed a third-party complaint against StarMed Staffing, Inc. ("StarMed"), alleging that it was liable for any negligence attributable to its nurse. Prior to trial, UMC and FBOR entered into settlement and release agreements. In UMC's contribution action against StarMed, the trial court determined that UMC was entitled to a rebuttable presumption of negligence and that the negligence of FBOR was irrelevant in portioning liability. The Florida appellate court reversed, reasoning that the court should have considered the "entire liability" of the alleged joint tort-feasors, such that the negligence of FBOR had to be considered. *Id.* at 731. *Wilkinson* is distinguishable from the present case, however, because FBOR, UMC, and StarMed were all parties to the action.

original defendants or as third parties.[17]  Rather, in *Owens–*

---

**17.** Moreover, when the General Assembly first enacted the Uniform Contribution Among Tortfeasors Act, in Chapter 344 of the Maryland Laws of 1941, then Section 27, entitled "Procedure and Practice," specifically governed third-party claims and cross-claims among joint tort feasors, stating, in relevant part:

> (a) Before answering, a defendant seeking contribution in a tort action may move ex parte or, after answering, on notice to the plaintiff, for leave as a third-party plaintiff to serve a summons and pleading upon a person not a party to the action who is or may be liable as a joint tortfeasor to him or to the plaintiff for all or part of the plaintiff's claim against him.  If the motion is granted and the summons and pleading are served, the person so served, hereinafter call the third-party defendant, shall make his defense to the claim of the plaintiff and to the third-party claim in the same manner as defenses are made by an original defendant to an original pleading. . . .  A third-party defendant may proceed under this section against any person not a party to the action who is or may be liable as a joint tortfeasor to him or to the third-party plaintiff for all or part of the claim made in the action against the third-party defendant.

> \*     \*     \*

> (c) A pleader may either (a) state as a cross-claim against a co-party any claim that the co-party is or may be liable to the cross-claimant for all or part of a claim asserted in the action against the cross-claimant;  or (b) move for judgment for contribution against any other joint judgment debtor, where in a single action a judgment has been entered against joint tortfeasors one of whom has discharged the judgment by payment or has paid more than his pro rata share thereof. . . .

As a result, the 1941 Act contained a provision dealing with the purely procedural issue of third-party practice in connection with the determination of "joint tort-feasor" status.  *See* Wendell D. Allen, *Joint Tortfeasors: Contribution, Indemnity and Procedure,* Paper read before the Barristers Club of Baltimore, Mar. 30, 1948.  In fact, prior to 1947, third-party practice was available only to joint tort-feasors.  *See* Section 27 of Article 50, Maryland Code (1947 Supp.); *see also Cotham v. Bd. of Cnty. Comm'rs for Prince George's Cnty.,* 260 Md. 556, 566, 273 A.2d 115, 120 (1971).  In 1947, the Court of Appeals adopted "General Rules of Practice and Procedure," including Rule 4 of Section III entitled "Joinder of Parties and Claims," Maryland Code (1947 Supp.), which relevantly provided:

> (a) *Motion by Defendant.*  Where the defendant in any action claims that a person not a party to the action is or may be liable to him for all or part of the plaintiff's claim against him, he may move for leave to serve a summons and claim upon such person as a third party. . . .

Former Rule 4 was codified in 1956 as Rule 315 of the Maryland Rules, the precursor to present Rule 2–332, governing third-party practice.  Meanwhile, in 1957, then Section 26 of Article 50, Maryland Code

*Illinois, Inc. v. Zenobia,* 325 Md. 420, 601 A.2d 633 (1992), we determined that only a party to an action may be deemed a "joint tort-feasor." In that case, Louis L. Dickerson and William L. Zenobia filed separate complaints seeking damages for injuries resulting from asbestos exposure against a number of manufacturers and installers of products containing asbestos, and the complaints were consolidated for purposes of trial and appeal. A jury awarded Mr. Dickerson $1.3 million in compensatory damages and Mr. Zenobia $1.2 million in compensatory damages. Pursuant to a stipulation, each defendant was deemed to have cross-claimed for contribution and indemnity against all other defendants. Raymark, Inc., an asbestos manufacturer, however, was not a party to the *Zenobia* case or the cross-claim stipulation in *Zenobia,* and had settled with Mr. Dickerson and Mr. Zenobia before trial. Anchor Packing Co., a defendant in the *Zenobia* case, sought indemnity from Raymark, asserting that Raymark was Anchor's primary source of asbestos containing products.

The trial judge granted defendants' cross-claims against all settling defendants, including Raymark, in the *Dickerson* and *Zenobia* cases. As a result, the compensatory damages verdicts were reduced proportionally in light of the releases between the plaintiffs and the settling defendants. In addition, the trial judge held that Anchor Packing was entitled to indemnity against Raymark in the *Zenobia* case. Thus, because of Mr. Zenobia's settlement and release of Raymark, the trial judge struck the jury's award against Anchor.

We reversed with respect to both claims. Regarding the *Dickerson* case, we reasoned that, because Raymark was named as a defendant in Mr. Dickerson's original complaint, the cross-claim stipulation included cross-claims against Raymark for contribution. We determined, nevertheless, that the trial judge erred, "because there was insufficient evidence to find that Raymark was a joint tort-feasor." *Id.* at 475, 601 A.2d at 660. We emphasized that "[n]o evidence was present-

---

(1951), the procedural provision of the Act, was repealed by Section 1 of Chapter 399 of the Maryland Laws.

ed against Raymark at the trial," such that the nonsettling defendants had not met their burden of demonstrating Raymark's joint tort-feasor status. *Id.*

We further held, in the *Zenobia* case, that, because Raymark was never named as a defendant, or impleaded as a third-party defendant pursuant to Rule 2–322, "[t]he trial court could not exercise jurisdiction to grant a cross-claim against Raymark." *Id.* at 474, 601 A.2d at 660. In so holding, we noted that Raymark was deprived of notice in contradiction with Rule 2–322 requiring service, upon a person not previously a party to the action, of a summons, the complaint, and all pleadings and motions previously filed in the action.

Here, as in the *Dickerson* case, Dr. Hashmi failed to present any evidence at trial against the three Good Samaritan Hospital employees. Moreover, as in the *Zenobia* case, Dr. Sahi, Nurse Bosse, and Nurse A were never named as defendants or impleaded by Dr. Hashmi as third-party defendants pursuant to Rule 2–322. As a result, our precedent does not comport with Dr. Hashmi's last-ditch effort to reduce his share of the judgment by seeking an adjudication of joint tort-feasor status of Dr. Sahi, Nurse Bosse, and Nurse A, who have not received notice or had an opportunity to defend. *See also Porter Hayden Co. v. Bullinger,* 350 Md. 452, 471–72, 713 A.2d 962, 971 (1998) (reasoning that a default judgment entered on an asbestos manufacturer's third-party claim against a third-party defendant constituted a determination of liability, such that the third-party defendant should be considered a joint tort-feasor under the Act); *Lerman v. Heeman,* 347 Md. 439, 446, 701 A.2d 426, 430 (1997) (determining that a jury verdict had pronounced Dr. Lerman and Dr. Heeman, defendants in a medical malpractice action, to be "joint tort-feasors," such that Dr. Heeman could seek contribution from his co-defendant, because he had paid more than his pro rata share of the judgment); *Owens–Corning Fiberglas Corp. v. Garrett,* 343 Md. 500, 532, 682 A.2d 1143, 1159 (1996) (concluding that a manufacturer of asbestos-containing products could not seek contribution from settling cross-defendants who were determined by the trier of fact not to be "liable in tort");

*Keene Corp. v. Levin,* 330 Md. 287, 293–94, 623 A.2d 662, 665 (1993) (reasoning that a final judgment may not be entered until cross-claim liability was determined, because if a cross-defendant is liable as a joint tort-feasor, there is a right of contribution which may reduce the amount of judgment); *Allgood v. Mueller,* 307 Md. 350, 355, 513 A.2d 915, 918 (1986) (determining that settling co-defendants who remained in case and were found not to be liable were volunteers regarding their payments to plaintiffs, and nonsettling defendant who was found liable was not entitled to a reduction of the judgment awarded against it); *Swigert v. Welk,* 213 Md. 613, 621–22, 133 A.2d 428, 432–33 (1957) (granting summary judgment in favor of settling third-party defendant was inappropriate, because the question of his negligence had yet to be determined); *Collier v. Eagle–Picher Industries, Inc.,* 86 Md.App. 38, 43–44, 585 A.2d 256, 259 (1991) (recognizing in an asbestos claim a general pre-trial order in which each of the defendants was deemed to have filed cross-claims for contribution against all other defendants); *Loh v. Safeway Stores, Inc.,* 47 Md.App. 110, 127, 422 A.2d 16, 26 (1980) (determining summary judgment in favor of grocery store and food producer was improper, despite settlement by injured party with food producer, because the producer specifically denied liability and thus, "there ha[d] been no determination of liability").

In so holding, we also find persuasive *Washington v. Washington Hospital Center,* 579 A.2d 177 (D.C.1990), in which the District of Columbia Court of Appeals was faced with an analogous scenario. In that case, a jury returned a verdict against Washington Hospital Center in connection with the improper administration of anesthesia, causing a patient to sustain severe brain damage. *Id.* at 180. Washington Hospital Center sought a reduction of the verdict, asserting that the other two alleged tort-feasors, the anesthesiologist, Dr. Walker, and the nurse-anesthetist, Nurse Adland, executed settlement agreements with the patient. *Id.* at 185. The court determined that the Hospital's "failure to keep that issue in the case by asserting a claim for contribution—either through a cross-claim or by a special jury verdict request—preclude[d]

application of a *pro rata* credit." *Id.* at 186. The court emphasized that the Hospital could reasonably have been expected to " 'safeguard any legitimate claim it might have to lessen the burden of a plaintiff's verdict' by asserting a cross-claim for contribution ... or an equivalent request for a determination by the jury of the settling defendants' negligence." *Id.* at 187–88, quoting *Hall v. General Motors Corp.,* 647 F.2d 175, 184 (1980). Although the District of Columbia has not adopted the Uniform Contribution Among Joint Tort–Feasors Act and relies instead on contribution as an equitable remedy, *George Washington University v. Bier,* 946 A.2d 372, 375 (D.C.2008), we nevertheless find appropriate the notion that only a party to the action may be deemed a "joint tort-feasor." *See Owens–Illinois, Inc. v. Zenobia,* 325 Md. 420, 473–75, 601 A.2d 633, 659–660 (1992).

In this case, Dr. Hashmi could have pursued a claim against any other alleged joint tort-feasors, other than those named in the original complaint, by filing a third-party complaint pursuant to Rule 2–332 and by seeking a special verdict, rather than by asserting the efficacy of a post hoc proceeding in which only he would proffer. Obviously, such a chimera will not be countenanced.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY PETITIONERS.**